STATE FARM FIRE AND CASUALTY COMPANY, an Illinois Corporation, Plaintiff and Counter defendant,

v.

Rhonda WINSOR and Pat Sherwood, Defendants and counter claimants.

No. 97–CV–187–J.

United States District Court, D. Wyoming.

May 11, 1998.

Michael K. Davis, Yonkee & Toner, Sheridan, WY, Jay Gilbertz, Sheridan, WY, for State Farm Fire and Casualty Company, an Illinois corporation, plaintiff.

William R. Fix, Jackson, WY, for Defendants.

## ORDER GRANTING DEFENDANT STATE FARM'S MOTION FOR SUMMARY JUDGMENT

ALAN B. JOHNSON, Chief Judge.

This matter is before the court on State Farm's Motion for Summary Judgment. The court finding that there are no material issues of fact and that State Farm is entitled to judgment as a matter of law, determines as follows:

### UNDISPUTED FACTS

1. Plaintiff State Farm and Casualty Company (State Farm), issued automobile liability policy SO97–676–C27–50 to defendant Pat Sherwood. This policy was in full force and effect on September 1, 1993. The policy limits for personal injury are $50,000.

The policy has several clauses relevant to this case:

The insured has the duty to cooperate with State Farm, and when asked, to assist in making settlements, securing and giving evidence, and attending hearings or trials.

The insured shall not make any payment or assume any obligation to others, and shall not incur any expense except for first aid to others.

State Farm agrees to defend any suit with attorneys "hired and paid by" State Farm.

There is no right of action under the policy's liability coverage until the amount of damages an insured is liable to pay has been finally determined by judgment after actual trial, or an agreement between the insured, the claimant, and State Farm.

Pl.'s Ex. A.

2. Defendant Rhonda Winsor is Ms. Sherwood's daughter. On September 1, 1993, Ms. Winsor was attempting to place an infant car seat in the back seat of Ms. Sherwood's vehicle. The vehicle was running. Ms. Sherwood turned to help her daughter and took her foot off the brake. The vehicle moved forward and caused Ms. Winsor to fall to the ground.

3. Ms. Winsor claims that she suffers low back pain and pain in her right leg as a result of her fall on September 1, 1993. Ms. Winsor made a claim against her mother under the State Farm policy based on her alleged injury.

4. Because Ms. Winsor made a bodily injury claim as well as a claim for medical payments under Ms. Sherwood's policy, State Farm opened two files for the accident and assigned them to separate claims representatives. The purpose of this split was State Farm's concern that there would be a conflict of interest if State Farm disputed whether medical payments were reasonable, necessary, or related to the accident. It was concerned that Ms. Winsor might argue that medical payments were withheld or delayed to force settlement of the bodily injury claim. Cetak Depo. at 33–35. State Farm does not permit its claims representative assigned to the bodily injury claim access to the medical records and information submitted to the claims representative assigned to the medical payments claim without a release from the claimant. *Id.* at 48. State Farm has the right to compel a medical examination under medical payment coverage but not under liability coverage. Policy at 5.

5. State Farm began to investigate the personal injury claim. It asked for medical authorization to see Ms. Winsor's medical records and received authorization on September 10, 1993.

6. In January of 1994, State Farm received an anonymous telephone call from an individual who alleged that Ms. Winsor had a preexisting back condition and then hung up. The claims representative decided to interview Ms. Winsor's doctor and set up an appointment for March 3, 1994.

7. Ms. Winsor hired Mr. Joe Darrah to represent her regarding her claims against State Farm. On March 3, 1994, Mr. Darrah sent a letter to Dr. Stephen Emery revoking Ms. Winsor's authorization to release medical information. This revocation was sent to Dr. Emery the day he was to be interviewed by a State Farm claims representative and the scheduled interview was canceled.

8. State Farm exercised its rights under the medical payments provision of the policy and asked Ms. Winsor to undergo an independent medical examination. Dr. Donald H. See performed the examination on March 7, 1995. Dr. See's report dated March 7, 1995, contains the following:

CURRENT SYMPTOMS consist of aches and pains felt broadly across the low lumbar region and intermittent numbness and tingling in the right posterior buttock, thigh and leg down to the ankle.... Her low back symptoms are the most severe and aggravating.... Her right leg symptoms have become gradually more intense over the past several months.

\* \* \*

WORK HISTORY ...

The patient denied any trouble with her back or legs prior to September of 1993. Her general health has been good except for morbid obesity.

\* \* \*

RADIOLOGIC STUDIES

\* \* \*

2. MRI, lumbar spine, dated November 24, 1993 shows an abnormal disc protrusion....

\* \* \*

Based on all the medical information made available to me and my examination of Rhonda Winsor, I will now answer your six specific questions to the best of my ability.

1. Clinical diagnosis is trauma to the lumbar spine causing injury to the intervertebral disc at L4–L5.... The prognosis is that the examinee will, more likely than not, continue to have back pain for an undetermined period of time. Although there are subjective symptoms of numbness and tingling in the leg, objective criteria for nerve root compression, ... are not present at this time.

2. It is my opinion that her current symptoms in regard to the lower spine and lower extremities are directly and solely the result of the accident that occurred on September 1, 1993.

\* \* \*

4. In regard to treatment at this time, this should consist of, hopefully, maintaining reasonable mobility and flexibility of the back and legs not requiring a formal therapy program. This examinee desperately needs to lose weight, although the prospect for this seems quite dismal.

5. The examinee's clinical condition is consistent with "DRE Lumbosacral Category II" which qualifies for a *5% whole person impairment* ...

6. It is my opinion that the examinee has reached a point of maximum medical improvement as of the date of this examination ...

Defs.' Ex. 1 (emphasis added).

9. As part of his examination, Dr. See reviewed Ms. Winsor's medical records as provided by State Farm. However, State Farm did not have a complete set of medical records and was prevented from obtaining such records by Mr. Darrah's revocation of Ms. Winsor's release shortly before the examination.

10. On March 22, 1994, Mr. Darrah sent Dr. Bruce Campbell a request for Ms. Winsor's medical records from the time of the accident forward. Because Ms. Winsor revoked her release for medical information, Dr. Campbell's records were not available to State Farm during this time.

11. On April 18, 1995, Mr. Darrah sent State Farm a letter demand for payment of policy limits on Ms. Winsor's behalf. The demand referenced Dr. See's report.

12. On April 27, 1995, State Farm declined Mr. Darrah's demand letter of April 18, 1995, because the claims representative did not agree with the monetary valuation of the claim. State Farm also asked for additional information including all of Ms. Winsor's medical records for the ten years prior to the accident. This letter explained that the medical payments claim was being handled separately and referred all questions on that claim to the other claims representative.

13. On October 13, 1995, Ms. Winsor filed a lawsuit against Ms. Sherwood in the District Court, Fifth Judicial District, Park County, Wyoming. Mr. Joe Darrah represented Ms. Winsor.

14. During the same time period as the state court complaint was filed, Mr. Darrah's office drafted a strongly-worded letter for Ms. Sherwood to mail to State Farm. This letter is dated October 9, 1995 and Ms. Sherwood signed it and mailed it to State Farm. The letter provides:

> I am writing this letter to inform you of my being sued. Enclosed please find copies of the Acceptance, Summons, and Complaint.
>
> As you are my insurance company, I want to know what we can do about this situation. I expect you to help me and get me a lawyer right away, as you certainly have not been of any real assistance to date.
>
> Please take case of this. This could have been settled long ago, in my opinion, by you.

Pl.'s Ex. J.

15. On October 20, 1995, State Farm notified Ms. Sherwood that it had assigned the defense of the case to the Godfrey Firm, a firm now known as Godfrey & Associates. State Farm also advised her that because the prayer for damages in the complaint was

unspecified, there might be a claim in excess of policy limits, and she was entitled to retain an attorney in addition to the lawyer assigned by State Farm to protect her interest at her own expense. State Farm defended Ms. Winsor without any reservation of rights. The state court action was set for trial on July 14, 1997.

16. Sometime after the state court action was filed, State Farm's claims representative for Ms. Winsor's personal injury claim first obtained a copy of Dr. See's report. At the same time, the claims representative received a copy of some of Ms. Winsor's medical records that had previously been withheld. The records were produced only after State Farm filed a motion to compel production in the state court action.

17. When finally produced to State Farm, Ms. Winsor's full medical records revealed that she suffered from chronic low back pain and pain in her right leg for several years before the accident. Dr. Bruce Campbell was Ms. Winsor's treating physician for several years. His notes of Ms. Winsor's office visit on July 10, 1989, are as follows:

> [Patient] presents with back pain. She injured herself lifting while she was pregnant over 1½ years ago. She never had x-rays because she was pregnant. The pain continued during the pregnancy and is somewhat better but it still persists. She complains of pain on the right side particularly when she bends over, twists or turns to the right. One day last week, she had a numbness and pain in her left leg for about 5 minutes, but since that time this has been resolved. She has no pain down the right leg.

\* \* \*

A: #1 Chronic low-back pain—probably complicated by her obesity. Claims File at 290.

18. On October 2, 1992, Ms. Winsor saw Dr. Campbell again, this time complaining of right leg pain. His notes of that visit are as follows:

> Rhonda is here w/rt leg pain. She has been having rt leg pain for about 6 wks. She really does not recall any injury. Pain

seems to come and go ... The pain can last for min's, hr's, or even days.... It will sometimes feel kind of burny & stingy @ times....

\* \* \*

A: #1 RT LEG Pain—cause is not clr—could be some type of superficial neuropathy.

*Id.* at 286.

19. Based upon the contradictory evidence in the medical file regarding Ms. Winsor's pre-existing back and leg problems, the claims representative disagreed with Dr. See's report and continued to believe Ms. Winsor's claims were in the range of $7,000 to $8,000.

20. On February 10, 1997, Mr. Brett Godfrey of the Godfrey Firm filed an offer of judgment in the amount of $7,000 in the state court case.

21. On February 21, 1997, Mr. Darrah filed Ms. Winsor's offer of judgment in the amount of $50,000 in the state court case.

22. Ms. Sherwood was diagnosed with cancer in the months before trial and underwent chemotherapy. In early July her deposition was scheduled. For reasons that are not explained due to "attorney-client privilege" Mr. Darrah contacted an attorney named Larry Grubbs and arranged for him to represent Ms. Sherwood regarding the deposition. Darrah Depo. at 68–70.

23. Mr. Grubbs contacted State Farm's attorneys by letter dated June 6, 1997. He inquired whether Ms. Sherwood needed a doctor's certification in order to testify by deposition instead of appearing at trial. The letter also stated that Ms. Sherwood was requesting that State Farm settle the case immediately within policy limits. There followed a flurry of letters and faxes between the Godfrey Firm and Mr. Grubbs. The Godfrey Firm notified Mr. Grubbs that it believed that the case was not worth anywhere near policy limits and stated its reasons. Although Mr. Godfrey told Mr. Grubbs that an excess verdict was unlikely, his letter stated that State Farm was not agreeing to indemnify Ms. Sherwood for any

possible excess verdict. A deposition date was arranged, Mr. Grubbs notified the firm that he would not attend the deposition and had no further involvement in the case.

24. An attorney for State Farm discussed Ms. Sherwood's proposed deposition with her and told her not to discuss the case with her daughter. Ms. Sherwood was in the midst of chemotherapy at the time and believed that State Farm's attorney told her not to talk to her daughter at all except for inconsequential things such as the weather. This upset Ms. Sherwood and she called an attorney, Bill Simpson, who had previously represented her in unrelated matters. Ms. Sherwood testified in her deposition that she asked Mr. Sherwood to "find out what was going on and what they [State Farm's attorneys] were doing" but did not discuss having Mr. Simpson replace Mr. Godfrey. Sherwood Depo. at 40–41. She felt that State Farm was not representing her properly and that its attorney should not be able to talk to her about not talking to her daughter. *Id.* at 38–41. Mr. Simpson agrees that Ms. Sherwood was very upset about her conversation with State Farm's lawyer. He testified in his deposition that she asked him to "get her out of the case" and that she wanted to fire the State Farm lawyers. Simpson Depo. at 10–23.

25. Mr. Simpson contacted Mr. Darrah on or about July 3, 1997, and the two immediately began settlement negotiations. Mr. Simpson asked for and received copies of materials from Mr. Darrah's file. State Farm was not notified that Ms. Sherwood had hired Mr. Simpson or that he was conducting settlement negotiations for Ms. Sherwood. On July 7, 1997, Mr. Simpson and Mr. Darrah had reached a settlement. Although Mr. Simpson believed the case to be worth $50,000 to $60,000, he agreed to Mr. Darrah's demand for a stipulated judgment in the amount of $227,500. Mr. Darrah agreed to prepare the documents. The documents were drafted on July 8, 1997, signed by Ms. Winsor on July 8 and by Ms. Sherwood on July 9, 1997. Mr. Darrah notified the state court of the settlement on July 7, 1997. Mr. Darrah did not notify State Farm or its lawyers of the settlement.

26. After the settlement was verbally finalized, Mr. Simpson called Mr. Brett Godfrey. This was the first notice State Farm had that Ms. Sherwood had hired Mr. Simpson. Mr. Simpson told Mr. Godfrey that he was going to attempt settlement but did not notify Mr. Godfrey of the amount or that settlement had, in fact, already been concluded. Mr. Godfrey told Mr. Simpson State Farm had already sent his client a letter agreeing to indemnify her for any excess verdict. He assured Mr. Simpson that Ms. Sherwood did not have to appear at trial. Mr. Simpson decided not to discuss this information with his client. He did not inform her of the letter or that it meant she would have no personal liability no matter what the jury decided. He did not inform his client that State Farm agreed she would not have to appear at trial. Mr. Simpson testified that by the time he called Mr. Godfrey he believed that the settlement was already binding. Mr. Simpson followed his phone call with a faxed letter to Mr. Godfrey saying that Ms. Sherwood was not satisfied with his firm's representation and asking him to arrange the firm's withdrawal. However, although he believed the settlement was binding, Mr. Simpson did not inform State Farm or its attorneys of the fact of the settlement agreement.

27. Prior to receiving any information about Mr. Simpson's representation of Ms. Sherwood or his purported settlement on her behalf, State Farm sent Ms. Sherwood the following letter, dated July 7, 1997:

This letter is to advise you we have received a settlement demand from Attorney Darrah in the amount of $50,000.00. Based on the investigation and our evaluation of alleged damages, we have offered $7,000.00 to conclude this matter. As a result, it appears a trial may be necessary to resolve this issue.

As you know, your State Farm policy has liability limits in the amount of $50,000.00. If we cannot resolve this matter prior to trial, we will protect you from any judgment, including amounts in excess of your policy limits. This will eliminate any possible financial exposure to your personal assets. In addition, State Farm will con-

tinue to provide you with a defense at our expense.

Our promise to provide this protection beyond your current policy limits is predicated upon your continued performance of your duties as outlined in the defense of a lawsuit, securing evidence, giving testimony, and attendance at hearings and trials when requested. In addition, our promise to provide you with this additional monetary protection shall be contingent upon you or anyone on your behalf not disclosing its existence to anyone without prior written consent.

Pl.'s Ex. N.

28. On July 8, 1997, Mr. Godfrey faxed a letter to Mr. Simpson stating that State Farm had the contractual right to control the selection of counsel and settlement decisions and attached a copy of State Farm's. July 7, 1997, letter to Ms. Sherwood, which he had discussed with Mr. Simpson the day before. Mr. Godfrey also stated:

I am also fearful that State Farm may interpret your letter as an attempt to cooperate with the Plaintiff's recovery rather than the defense of the claim, which could damage our client's coverage position. I would therefore ask that you communicate directly with State Farm concerning the matter related to the specific defense of the claim but that you do so in a fashion which will not damage the present excellent coverage situation which exists.

Pl.'s Ex. R.

29. On July 8, 1997, the Godfrey firm learned that the state court trial had been canceled due to a settlement. The parties dispute when Mr. Darrah notified the state court that the case was settled. However it is not disputed that July 9 was the first notice to the Godfrey Firm or to State Farm that the trial was canceled or that Ms. Sherwood had settled.

30. Although Mr. Simpson testified that obtaining a covenant not to execute was his primary concern for his client, the Settlement does not provide such a covenant and Ms. Sherwood is liable for the entire amount under the settlement. The Settlement was followed by an undated Amendment signed by Ms. Winsor and Ms. Sherwood. Pl.'s Ex. P. The Amendment does not contain a covenant not to execute. It does provide that Ms. Sherwood assigned 95% of any bad faith or malpractice claims against State Farm and/or the Godfrey firm to Ms. Winsor. The Amendment provides that the parties will split the proceeds of any such suit.

31. On July 10, 1997, State Farm sent Ms. Sherwood a reservation of rights letter reserving its rights due to "allegations or evidence of Ms. Sherwood's interference with the Company's efforts to defend this claim." Up to July 10, 1997, after it learned of Mr. Simpson's settlement of the case on Ms. Sherwood's behalf, State Farm defended Ms. Sherwood with out reservation of rights.

32. On July 9, 1997, Brian Cetak, a State Farm Claims Superintendent, sent a memo on the Sherwood file to the Divisional Claim Superintendent. That memo states in part:

You have a DCS file set up on this claim as this one was scheduled to go to trial next week. There have been some very irregular events which have occurred over the last 24 hours. First one of plaintiff's attorney's friends has now written a letter on behalf of our insured asking that Brett Godfrey withdraw from the defense of the case since our insured is not comfortable with Brett. As you know this lawsuit entails a daughter suing her mother, and we have always suspected these two parties of conspiring against us.

Def.s' Ex. 2.

The memo also explains how State Farm and the Godfrey Firm first heard of the settlement through the information from the clerk of court that the trial was vacated due to settlement.

33. Pursuant to the written stipulation and agreement of the parties, the state court entered judgment in favor of Ms. Winsor and against Ms. Sherwood in the amount of $227,500. Mr. Godfrey appeared at that hearing and Mr. Simpson fired Mr. Godfrey as Ms. Sherwood's attorney.

34. On July 31, 1997, State Farm filed this diversity case seeking declaratory judgment that it is not obligated to pay a judgment entered as a result of the agreement

between Ms. Sherwood and Ms. Winsor based upon a breach of the cooperation clause and other provisions of the policy. Defendants counterclaimed for bad faith.

35. Ms. Sherwood died on January 15, 1998.

## CONCLUSIONS OF LAW

The standard for the grant or denial of summary judgment is well known: ·

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. If the movant bears the burden of showing the absence of a genuine issue of material fact, the nonmovant may not rest on its pleadings but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.

*Mesa Oil, Inc. v. Ins. Co. of North America*, 123 F.3d 1333, 1336, (10th Cir.1997).

█ The court finds that there are no material issues of fact on the question of breach of Ms. Sherwood's duties under the policy. The policy prohibits Ms. Sherwood as insured from entering into an agreement and confessed judgment without the consent of State Farm.

There is no question that Ms. Sherwood breached this agreement. There is no question that State Farm and the attorneys handling the case did not have any notice of her doing so until after the agreement was final. State Farm was not even given notice that she had obtained separate counsel for the purpose of "getting out of the case" until that counsel had already entered into what he considered to be a binding agreement accepting liability far in excess of policy limits.

Defendants contend that under the case *Insurance Company of North America v. Spangler*, 881 F.Supp. 539 (D.Wyo.1995), this court has approved settlements such as that entered into by Ms. Sherwood. This court does not agree.

In *Spangler*, this court determined that the Wyoming Supreme Court would, if presented with the question, hold that an insured who is being defended under a complete reservation of rights could enter into an agreed judgment, commonly called a *Damron* agreement, with a plaintiff in order to protect himself or herself from an excess judgment. This holding was based upon cases from other jurisdiction holding that an insurer which refuses to defend or denies coverages loses the right to control the litigation. *Id.* at 544. In *Spangler* this court also followed case law holding that it was not a breach of an insured's "duty to cooperate" clause to enter into an unauthorized agreement protecting himself or herself from further liability in a case when the insurance company defends the case only under a reservation of rights. *Id.* at 545 (following *United Services Auto. Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987) and *Miller v. Shugart*, 316 N.W.2d 729 (Minn.1982)).

Defendants contend that *Spangler* is not limited only to cases where the insurer has denied coverage or defends under a reservation of rights. This court disagrees. That is exactly the circumstance where the rationale of *Spangler* is applicable. *See Buysse v. Baumann–Furrie & Company*, 448 N.W.2d 865, 871 (Minn.1989) (*Miller* rule has no application where insurer not denying coverage) and *State Farm Mut. Auto. Ins. v. Peaton*, 168 Ariz. 184, 812 P.2d 1002, 1011 (App.1990) (insured violated duty of cooperation by entering into *Damron* agreement where insurer did not breach express contractual obligation).

Accordingly, there being no issue of fact on whether Ms. Sherwood breached her duty to cooperate and duty to not enter into any agreement assuming liability, there is no coverage. Further, where there is no agreement as to liability that includes State Farm and the amount of damages has not been determined by judgment after actual trial, there is no right of action under the policy's liability coverage. Accordingly, State Farm is entitled to summary judgment on its claim for declaratory relief.

State Farm also moves for summary judgment on defendants' counterclaim for bad faith.

The *Wyoming Supreme Court* recently examined insurance third-party bad faith:

"A cause of action for 'third party' bad faith will lie when a liability insurer fails in bad faith to settle a third-party claim within policy limits against its insured." *Herrig*, 844 P.2d at 490. Wyoming first recognized this claim in *Western Cas. & Sur. Co. v. Fowler*, 390 P.2d 602, 605–06 (Wyo.1964). There, an employee sued an employer after falling from a ladder. Although the employee offered to settle the claim well within the employer's insurance policy limit of $10,000, the insurer refused the employee's offer. At trial, the employee was awarded over $18,000.00. Eventually, the matter was settled when the insurer paid the policy limit, and the insured/employer was required to pay $5,000.00. The insured then successfully sued his insurer for the difference between the settlement and the insurance policy limits. On appeal, the insurer argued that the evidence was insufficient to show bad faith and that the district court erred in its instructions defining bad faith. *Id.* at 603.

We affirmed the district court's definition of the duty of the insurer to the insured as follows:

[I]t was the defendant's duty to exercise intelligence, good faith, and honest and conscientious fidelity the common interest of the insured, and, if it fails to do so, it acts in bad faith. *** "Bad Faith" or conversely "good faith" must be determined as of the time the offer was made and rejected and that good faith meant a bona fide belief that the insurer had a good possibility of winning the lawsuit or that the claimant's recovery in the lawsuit would not exceed the limits of the insurance policy.

*Id.* at 606.

*Jarvis v. Farmers Ins. Exchange*, 948 P.2d 898, 900 (Wyo.1997).

In *Jarvis*, the Wyoming Supreme Court held a "cause of action by an insured against the insurer for a failure, in bad faith, to settle a claim will not accrue prior to the entry of a judgment against the insured in excess of policy limits." 948 P.2d at 902.

Defendants claim that the following are indicative of bad faith: (1) State Farm's failure to settle for policy limits when the report of the independent medical examiner, Dr. See, states that the claimant has a permanent 5% impairment that is caused by the accident; and (2) the Cetak memo stating that the two claims supervisors have always believed that the defendants were conspiring against State Farm regarding the claim.

These facts, alone or in combination, do not form the basis of a claim of bad faith in the context of the undisputed facts in this case.

It is undisputed that the See report was not disclosed to those responsible for the personal injury case until well into the state court case. It is undisputed that it was disclosed at the same time as other medical records which directly contradicted Ms. Winsor's information to Dr. See. In view of the directly contradictory evidence from previously undisclosed medical records, it was not bad faith for State Farm to refuse to settle for full policy limits on the basis of the See report. Although the report was prepared by State Farm's own expert, it is undisputed that the expert relied on incomplete information. Under these circumstances the See report is not solid evidence of the cause of Ms. Winsor's back and leg problems and State Farm was entitled to rely on all of the information contained in the complete medical records in evaluating the dollar value of the claim.

It is undisputed that Mr. Godfrey's theory of the value of the case was based upon the evidence supporting the following: (1) Ms. Winsor's injuries were pre-existing and therefore not the result of the covered accident; (2) Ms. Winsor's obesity was a major contributing factor to her injuries; and (3) Ms. Winsor had lied about her preexisting injuries in her answers to interrogatories and to her doctors. It was Mr. Godfrey's opinion that Ms. Winsor would be an unbelievable witness because she had previously lied. Mr. Godfrey's position was that the jury would

have no sympathy for Ms. Winsor because she purportedly lied to her terminally ill mother by telling her that her pain was caused by her mother's negligence instead of disclosing her previous problems. Plaintiff has established that the insurer had a bona fide belief that it had a good possibility of winning the lawsuit or that the claimant's recovery in the lawsuit would not exceed the limits of the insurance policy. Defendant has not come forward with any evidence to show that such a belief was not bona fide or was the basis of disregarded evidence strongly in favor of a judgment in excess of policy limits.

In *Jarvis* the court noted the standard as applied in *Fowler*,

> As we stated in *Fowler*, 390 P.2d at 606, "the crucial factor *** is whether evidence available to defendant upon proper investigation strongly showed there was liability of the [insured] and was, in bad faith, disregarded by the insurer when offer of settlement was made." This necessarily assumes that the strong evidence regarding the insured's liability exists.... Were we to adopt the Jarvises' argument, an insurer would be subject to suit for failing to settle even the most frivolous of claims if the person claiming against the insured was willing to settle within policy limits at the outset.

948 P.2d at 902.

In this case the issue was not liability. Instead the issues were the cause and amount of damages. However, the above-cited analysis is equally applicable to the insured's refusal to settle the amount of damages within policy limits. The undisputed facts show a proper investigation, slowed by Ms. Winsor's refusal to release her full medical records. They show that the issue of the cause of Ms. Winsor's problems was in genuine dispute, *i.e.* whether her problems were pre-existing problems that had nothing to do with the accident. As discussed above, in the opinion of State Farm's experienced trial counsel, there was a very good possibility that the verdict after trial would be minimal. Based upon these undisputed facts, there can be no claim for bad faith because there is no showing State Farm disregarded strong evidence when the offer was made. The court

agrees with plaintiff that the See report was not "strong evidence" because it is undisputed that it was based on incomplete or false information provided by the claimant.

■ Defendants contend that the Cetak memo shows "unfounded bias" toward the claim. To the contrary, there is nothing inherently improper in an insurer's examining an inter-family claim to determine if there is collusion. We do not look to an insurance company's subjective belief about the claim to determine third-party bad faith. Instead, we look at its actions objectively at the time it decided to reject the offer of settlement within policy limits.

At the time of the Cetak memo, State Farm knew that the parties were close family members; that Ms. Winsor had failed to disclose her pre-existing injuries in her answers to interrogatories; that she had failed to disclose them during her independent medical examination; that Ms. Sherwood was living with Ms. Winsor; that Ms. Winsor's attorney's office had drafted a letter for Ms. Sherwood to send regarding the lawsuit and demands to settle; that she had entered into an unauthorized settlement far in excess of her daughter's last offer of judgment; and that she had kept the settlement negotiations a secret until after agreement was reached.

The Cetak memo does not constitute evidence that State Farm disregarded strong evidence that could lead to an excess verdict when it refused the offer of judgment within policy limits.

Because defendants have not come forward with evidence that could establish their claim of bad faith, the court need not determine whether a claim for third-party bad faith is stated when the insured voluntarily accepts liability in excess of policy limits despite the insurer's promise to indemnify her for any judgment in excess of policy limits.

Accordingly, State Farm is entitled to summary judgment on defendants' counterclaim of bad faith. The court will enter a judgment in favor of State Farm and against Ms. Sherwood and Ms. Winsor on all claims. Within ten days of the entry of this order defendants' counsel shall inform the court

whether Ms. Sherwood's estate should be substituted as a party.