2002 WY 122

**GAINSCO INSURANCE COMPANY,**
Appellant (Defendant/Garnishee),

v.

**AMOCO PRODUCTION COMPANY,**
Appellee (Plaintiff/Garnishor).

No. 00–302.

Supreme Court of Wyoming.

Aug. 19, 2002.

Rehearing Denied Sept. 17, 2002.

Donn J. McCall and Hampton K. O'Neill of Brown, Drew & Massey, LLP, Casper, Wyoming, Representing Appellant.

* Chief Justice at time of oral argument.

Mark W. Gifford, Casper, Wyoming, Representing Appellee.

Before HILL, C.J., and GOLDEN, LEHMAN,* KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] The appellant, Gainsco Insurance Company (Gainsco), appeals from an order granting summary judgment to the appellee, Amoco Production Company (Amoco), in an insurance coverage dispute. The district court determined that Gainsco was guilty of both first-party and third-party bad faith in denying coverage and refusing to settle the underlying claim. We reverse and remand to the district court for entry of a judgment in favor of Gainsco.

## NATURE OF THE CASE

[¶ 2] Amoco entered into a Well and Lease Service Master Contract (the Contract) with Andrews Trucking Company (Andrews). Under the Contract, Andrews agreed to indemnify Amoco against liability for injury to or death of Andrews' employees and Andrews' subcontractors' employees, even if caused by Amoco's negligence, and agreed to insure this assumption of liability. Andrews then obtained insurance from Gainsco.

[¶ 3] Andrews subsequently subcontracted the work covered by the Contract to Kobbe Construction Company (Kobbe). On November 15, 1991, Brent Abraham (Abraham), a Kobbe employee, was overcome by and died from poisonous hydrogen sulfide gas while emptying a vacuum truck in the Elk Basin Oil Field, an oil field operated by Amoco. The Abraham Estate filed a wrongful death action against Amoco, Andrews, and Kobbe. The claim against Kobbe was dismissed because of worker's compensation immunity. Summary judgment in favor of Andrews was affirmed on appeal to this Court because Andrews "never assumed any affirmative duties regarding job site safety and, therefore, did not owe the deceased a legal duty." *Abraham v. Andrews Trucking Co.*, 893 P.2d 1156, 1157–58 (Wyo.1995). Amoco settled for $650,000.00.

[¶ 4] Amoco then initiated the current controversy by suing Andrews under the Contract's indemnity provision. Gainsco provided Andrews a defense and filed a third-party complaint against Kobbe based on equitable implied indemnity. However, Gainsco defended Andrews under a reservation of rights, denying coverage based on two policy exclusions: a "total pollution" exclusion and an "insured contract" exclusion. In late 1994 and again in early 1995, Amoco informed Gainsco that it would settle for $297,000.00, within policy limits, to avoid exposing Andrews to an excess judgment. Gainsco refused the offer. Through separate counsel, Andrews then settled with Amoco on the following terms: (1) Andrews would confess judgment in the amount of $716,490.80 plus interest and attorneys' fees; (2) Amoco would not execute against Andrews, but would look only to Gainsco; (3) Andrews would assign to Amoco any bad faith claims against Gainsco; and (4) Andrews would dismiss its indemnity claim against Kobbe.

[¶ 5] The instant case started when Amoco sued Gainsco as garnishee of the confessed judgment. The parties agreed to treat the case as a declaratory judgment action and both sides filed motions for summary judgment. The district court granted Amoco's motion for summary judgment, and this appeal followed.

## ISSUES

[¶ 6] We will restate the separate issues presented by the parties as follows:

1. Did the district court err as a matter of law when it held that Gainsco's rejection of Amoco's settlement offers amounted to third-party bad faith, because Andrews, who negotiated a unilateral settlement agreement, suffered no damages and thus failed to prove an element of the tort of insurance bad faith?

2. Did the district court err as a matter of law when it held that Gainsco's rejection of Amoco's settlement offers amounted to third-party bad faith, because, under *Western Cas. & Sur. Co. v. Fowler*, 390 P.2d 602 (Wyo.1964), there could be no bad faith because Amoco's recovery against Andrews could not, as a matter of law, exceed the limits of Andrews' policy with Gainsco?

3. Did the district court err as a matter of law when it held that Gainsco's denial of coverage to Andrews amounted to first-party bad faith, because the total pollution exclusion made the question of coverage fairly debatable?

4. Did the district court err as a matter of law when it held that Gainsco's denial of coverage to Andrews amounted to first-party bad faith, because the insured contract exclusion made the question of coverage fairly debatable?

5. Did the district court err as a matter of law when it held that Amoco's indemnity claim was covered under Andrews' policy with Gainsco, when the total pollution exclusion showed no coverage existed?

6. Did the district court err as a matter of law when it held that Amoco's indemnity claim was covered under Andrews' policy with Gainsco, when the insured contract exclusion showed no coverage existed?

7. Did the district court err as a matter of law when it ignored Gainsco's argument that it was prejudiced when Amoco and Andrews failed to notify it that one term of the settlement agreement was Andrews' dismissal of its third-party complaint against Kobbe?

8. Did the district court err as a matter of law when it held that the stipulated judgment amount of $795,901.00 was a reasonable amount?

9. Did the district court err as a matter of law when it held that the total stipulated judgment amount was enforceable by Amoco against Gainsco?

10. Does the law of the case doctrine prevent Gainsco from raising the argument in this appeal that the express $300,000.00 limit of Andrews' liability contained in the Contract is a complete defense to any bad faith claim asserted by Amoco?

11. Does the indemnity provision of the Contract between Amoco and Andrews violate Wyo. Stat. Ann. § 30–1–131 (Lexis-Nexis 2001)?

## STANDARD OF REVIEW

[¶ 7] Procedurally, we are reviewing a summary judgment granted in a declaratory judgment action. Declaratory judgments are sought under Wyo. Stat. Ann. §§ 1–37–101 through 1–37–115 (LexisNexis 2001) and summary judgments are governed by W.R.C.P. 56. Declaratory judgment actions are commonly used to contest insurance policy coverage issues. *See, e.g., Pribble v. State Farm Mut. Auto. Ins. Co.,* 933 P.2d 1108 (Wyo.1997); *Doctors' Co. v. Insurance Corp. of America,* 864 P.2d 1018 (Wyo.1993); and *Mountain West Farm Bureau Mut. Ins. Co. v. Hallmark Ins. Co.,* 561 P.2d 706 (Wyo. 1977).

When this court reviews a grant of summary judgment entered in response to a petition for declaratory judgment, we invoke our usual standard for review of summary judgments.... The summary judgment can be sustained only when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.... In this instance, there is no contention that any genuine issue of material fact exists, and our concern is strictly with the application of the law.... We accord no deference to the district court on issues of law and may affirm the summary judgment on any legal grounds appearing in the record.

*Wyoming Community College Com'n v. Casper Community College Dist.,* 2001 WY 86, ¶ 11, 31 P.3d 1242, 1247 (Wyo.2001).

Our established rules of contract interpretation apply to insurance policies.... Interpretation is the process of ascertaining the meaning of the words used to express the intent of the parties.... The intent of the parties is determined by considering the instrument which memorializes the agreement of the parties as a whole.... This court utilizes a standard of interpretation for insurance policies which declares that the words used are given the plain meaning that a reasonable person, in the position of the insured, understands them to mean....

If the language is unambiguous, our examination is confined to the "four corners" of an integrated contract and extrinsic evidence is not admitted to contradict the plain meaning.... The language of an insurance policy is ambiguous if it is capable of more than one reasonable interpretation.... Because insurance policies represent contracts of adhesion where the insured has little or no bargaining power to vary the terms, if the language is ambiguous, the policy is strictly construed against the insurer.... However, the language will not be "tortured" to create an ambiguity.

*Doctors' Co.,* 864 P.2d at 1023–24.

## THE CONTRACT

[¶ 8] Andrews' duty to indemnify Amoco is contained in paragraphs 10 and 11(b) of the parties' Contract:

10. In order to eliminate controversies between [Andrews], its Subcontractors and Amoco and its joint owners, if any, and their respective insurers, [Andrews] assumes all liability for and hereby agrees to defend, indemnify and hold Amoco, its joint owner or owners, if any, and their insurers, harmless from and against any and all losses, costs, expenses and causes of action, including attorney's fees and court costs, for injuries to and death of [Andrews'] and its Subcontractor's employees, arising out of, incident to, or in connection with any and all operations under this contract and whether or not such losses, costs, expenses and causes of action are occasioned by or incident to or the result of the negligence of Amoco, its joint owner or owners, if any, and its agents, representatives and employees. [Andrews] agrees to insure this assumption of liability. The liability assumed by [Andrews] pursuant to this clause shall be limited to the amounts carried by [Andrews'] current liability insurance, but in no event shall it be less than the minimum limits set out in Paragraph 11(b), below.

11. ...

...

(b). Comprehensive General Liability Insurance, including Contractual Liability coverage, with minimum limits of $100,000 each person, and $300,000 each

occurrence for Bodily Injury and 100,000 each occurrence for Property Damage.

## THE INSURANCE POLICY

[¶ 9] To cover its assumed obligations under the Contract, Andrews purchased from Gainsco a $300,000.00 commercial general liability policy.[1] At issue are two coverage exclusions, "total pollution" and "insured contract." The pollution exclusion is covered in two places in the policy. A separate notice following the declarations page reads as follows:

### IMPORTANT NOTICE TO POLICY HOLDER TOTAL POLLUTION EXCLUSION

This policy contains restrictive language limiting the coverage provided under your policy, including a TOTAL POLLUTION EXCLUSION. This policy does not provide any coverage for pollution. The policy exclusion reads as follows:

POLLUTION EXCLUSION

This insurance does not apply to and no duty to defend is provided for:

1. "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time; or

\* \* \*

Pollutants mean any solid, liquid, gaseous, bacterial or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

Nearly identical language is then repeated in an endorsement attached to the policy.

[¶ 10] The second coverage restriction takes the form of an exclusion from the definition of "insured contract." The route to the exclusion is somewhat tortuous in that it is the equivalent of at least two double negatives. First, the policy states that it

does not apply to bodily injury or property damage for which the insured's liability arises out of its contractual assumption of liability. Then, the policy excludes from that exclusion liability that is assumed under an "insured contract." Next, the policy defines "insured contract" to include those contracts under which the insured assumes the tort liability of another. Finally, in a separate endorsement, the policy contains the exclusion that is at issue in this case:

6. "Insured contract" means any written:

 \* \* \*

 f. That part of any other written contract or agreement pertaining to your business under which you assume the tort liability of another to pay damages because of "bodily injury" or "property damage" to a third person or organization, if the contract or agreement is made prior to the "bodily injury" or "property damage." *However, this insurance does not apply to that part of any contract or agreement that indemnifies any person or organization for the indemnitee's sole tort liability.* Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

(Emphasis in original.)

[¶ 11] One additional issue is raised by the language of the first paragraph of the "coverages" section of the policy, in which the "insuring agreement" is defined:

We will pay those sums *that the insured becomes legally obligated to pay as damages* because of "bodily injury" or "property damage" to which this insurance applies.

(Emphasis added.)

## DISCUSSION

[¶ 12] Before discussing the individual issues, it may be helpful first to review the separate concepts of first-party bad faith and third-party bad faith:

---

1. Sometimes also known as a comprehensive general liability policy a "CGL" is an insurance policy usually "obtained by a business, that covers damages that the insured becomes legally obligated to pay to a third party because of bodily injury or property damage." *Black's Law Dictionary* 809 (7th ed.1999).

The duty of good faith and fair dealing which is implied by law to inhere in every insurance policy runs from the insurer to the insured.... Breach of this duty may give rise to a cause of action for "third party" bad faith or for "first party" bad faith. A cause of action for "third party" bad faith will lie when a liability insurer fails in bad faith to settle a third-party claim within policy limits against its insured.... Bad faith in this context would occur if an excess judgment were obtained under circumstances when the insurer failed "to exercise intelligence, good faith, and honest and conscientious fidelity to the common interest of the [insured] as well as of the [insurer] and [to] give at least equal consideration to the interest of the insured." ... A cause of action for "first party" bad faith will lie when an insurer in bad faith refuses to pay its insured's direct claim for policy benefits.... Bad faith in this context would occur if an insurer knowingly or recklessly denied a first-party claim for insurance benefits without having a reasonable basis for doing so. *Herrig v. Herrig,* 844 P.2d 487, 490 (Wyo. 1992) *(quoting Fowler,* 390 P.2d at 606).

[¶ 13] Third-party bad faith, or conversely good faith, "must be determined as of the time the offer was made and rejected and that good faith [means] a bona fide belief that the insurer had a good possibility of winning the lawsuit or that the claimant's recovery in the lawsuit would not exceed the limits of the insurance policy." *Fowler,* 390 P.2d at 606. "The governing standard is whether a prudent insurer would have accepted the settlement offer if it alone were to be liable for the entire judgment." *Betts v. Allstate Ins. Co.,* 154 Cal.App.3d 688, 201 Cal.Rptr. 528, 538 (1984). This is an objective, rather than a subjective, standard. *State Farm Fire and Cas. Co. v. Winsor,* 5 F.Supp.2d 1258, 1266 (D.Wyo.1998).

[¶ 14] An objective standard is also used to determine whether an insurer has committed first-party bad faith. *Kirkwood v. CUNA Mut. Ins. Soc.,* 937 P.2d 206, 211 (Wyo.1997). The question is whether the validity of the denied claim is fairly debatable. *First Wyoming Bank, N.A., Jackson*

*Hole v. Continental Ins. Co.,* 860 P.2d 1094, 1101 (Wyo.1993). The validity of a claim is fairly debatable if a reasonable insurer would have denied or delayed payment of benefits under the facts and circumstances. *Ahrenholtz v. Time Ins. Co.,* 968 P.2d 946, 950 (Wyo.1998). To establish a claim for first-party bad faith, a plaintiff must establish (1) the absence of any reasonable basis for denying the claim, and (2) the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. *Id.* at 950–51.

**Issue No. 1: Did the district court err as a matter of law when it held that Gainsco's rejection of Amoco's settlement offers amounted to third-party bad faith, because Andrews, who negotiated unilateral settlement agreement, suffered no damages and thus failed to prove an element of the tort of insurance bad faith?**

[¶ 15] Gainsco's position on this issue is straightforward: Third-party bad faith is a tort. *State Farm Mut. Auto. Ins. Co. v. Shrader,* 882 P.2d 813, 825–26 (Wyo.1994). "[A] tort is not complete and actionable until all the elements, duty, breach, proximate cause, *and damage,* are present." *Davis v. City of Casper,* 710 P.2d 827, 829 (Wyo.1985) (emphasis added). Because, the argument then goes, Andrews never suffered any damages, Andrews' assignee Amoco has no tort to pursue. Gainsco premises its theory that Andrews was not damaged on two facts. First, the Amoco–Andrews settlement agreement included Amoco's covenant not to execute against Andrews and Amoco's further promise to provide whatever release of lien Andrews might require in the future to transfer property. Second, the Amoco–Andrews settlement agreement limited Amoco's recovery on any indemnity claim to the insurance proceeds. Gainsco then contends that, inasmuch as the Gainsco–Andrews insurance policy requires Gainsco to pay only "those sums that the insured becomes legally obligated to pay as damages," and inasmuch as the settlement agreement leaves Andrews legally obligated to pay nothing as damages, there is nothing for Gainsco to pay.

[¶ 16] Wyoming has recognized as a basic premise that no third-party bad faith cause of action for failure to settle will accrue against an insurer until entry of a judgment against the insured in excess of policy limits. *Jarvis v. Farmers Ins. Exchange*, 948 P.2d 898, 901–02 (Wyo.1997); *Sabins v. Commercial Union Ins. Companies*, 82 F.Supp.2d 1270, 1278 (D.Wyo.2000). The next question is, where a judgment in excess of policy limits has resulted from a settlement between the insured and the claimant rather than from a trial, and as part of that settlement the insured is insulated by a covenant not to execute or similar device, may the claimant, as the insured's assignee, pursue a third-party bad faith claim against the insurer?

[¶ 17] In *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608 (6th Cir.1995), the insured and the claimant settled a personal injury lawsuit that was being defended by the insurer. The settlement, which occurred without the insurer's participation, included a confessed judgment in excess of policy limits and an agreement by the claimant to enter a release and satisfaction of judgment as to the insured. The insured's payment of its policy limits to the claimant did not thwart the claimant's subsequent third-party bad faith suit. In granting summary judgment to the insurer, the United States Court of Appeals for the Sixth Circuit concluded that, under Ohio law, a non-adjudicated confessed judgment coupled with no risk to the insured under that judgment does not create a viable cause of action for third-party bad faith. *Id.* at 611–15.

[¶ 18] A similar situation occurred in *Willcox v. American Home Assur. Co.*, 900 F.Supp. 850 (S.D.Tex.1995), with the main difference being a covenant not to execute against the insured rather than a release and satisfaction of judgment. Applying Texas law, the district court held that the claimant's covenant not to execute against the insured precluded the claimant, as assignee of the insured's third-party bad faith claim, from recovering amounts in excess of the policy limits. *Id.* at 856–57. The court's rationale was as follows:

"To recover more than the policy limits from the insurer, the judgment creditor must assert the insured's injury. If the judgment cannot be enforced against the insured, no such injury exists. The insured may assign to his judgment creditor any claim he has against his insurer for payment of the excess award, but such assigned claim is actionable only as long as the insured remains liable for the excess damages. To allow the creditor to release the insured from liability for such excess damages without effecting the release of the insurer would give the creditor and insured the power unilaterally to extend the insurer's liability. This would defeat, not serve, public policy."

*Id.* at 857 (*quoting Whatley v. City of Dallas*, 758 S.W.2d 301, 310 (Tex.App.1988)). The court went on to hold, however, that neither a covenant not to execute nor a covenant not to enforce a settlement agreement will excuse the insurer from its obligation to pay covered claims up to the policy limits. *Willcox*, 900 F.Supp. at 857.

[¶ 19] In its appellate reply brief, Gainsco contends that a newly published case is dispositive of this issue. *Marathon Ashland Pipe Line LLC v. Maryland Cas. Co.*, 243 F.3d 1232 (10th Cir.2001), arose in Wyoming and was decided under Wyoming law. In a factual situation quite similar to the one now before this Court, the United States Court of Appeals for the Tenth Circuit noted that a third-party bad faith cause of action is based upon an insurer's refusal to settle a third-party claim against the insured within policy limits. *Id.* at 1250. The court then went on to say:

The Wyoming Supreme Court has held that such a claim will not accrue until after a judgment has been entered against the insured in excess of the policy limits. *See [Jarvis*, 948 P.2d] at 902. Because it is undisputed that the judgment against [the insured] has not been enforced against it, we agree with the district court that [the insurer] was entitled to summary judgment on this claim. . . .

*Marathon Ashland Pipe Line LLC*, 243 F.3d at 1250.

[¶ 20] In response to Gainsco's argument on this first issue, Amoco concedes that some courts have, indeed, held that the existence of a covenant not to execute in this situation means that the insured has suffered no damage and, therefore, has no third-party bad faith cause of action to assign to the claimant. Amoco contends, however, that the majority of courts do not take that position.

[¶ 21] Amoco refers us first to *Insurance Co. of North America v. Spangler*, 881 F.Supp. 539 (D.Wyo.1995). In *Spangler*, the insurer defended a wrongful death action under a reservation of rights as to coverage, and also brought a separate declaratory judgment action to test coverage. The claimant and the insured then settled the wrongful death action for an amount within policy limits, and the claimant covenanted not to execute against the insured. The insurer then amended its complaint in the declaratory judgment action to raise the issue of the enforceability against it of the stipulated judgment. *Id.* at 541–42. The specific issue addressed in *Spangler* is similar to the issue now before this Court:

> Is the assignee of the insured barred from recovery from the insurer for a stipulated liability to which the insurer did not consent and the insured is not personally liable?

*Id.* at 543. Because this question had not previously been answered by this Court, the federal court made its "best estimate" as to how this Court would rule on the question. *Id.* at 544. In answering the question in the negative, the federal court emphasized two facts: (1) an insurer defending under a reservation of rights "loses the right to control the litigation;" and (2) a covenant not to execute is not a complete release of all liability. *Id.*[2]

[¶ 22] Other courts have also concluded that a covenant not to execute is not the equivalent of a release in that it does not totally extinguish the effects of the judgment. For example, the judgment may affect the insured's credit in the future. For that reason, these courts find that, despite the existence in the settlement of a covenant not to execute, the insured retains a cause of action for third-party bad faith that may be assigned to the claimant. *See Consolidated American Ins. Co. v. Mike Soper Marine Services*, 951 F.2d 186, 191 (9th Cir.1991); *McLaughlin v. National Union Fire Ins. Co.*, 23 Cal.App.4th 1132, 29 Cal.Rptr.2d 559, 572 (1994); *McLellan v. Atchison Ins. Agency, Inc.*, 81 Hawai'i 62, 912 P.2d 559, 563–65 (1996); *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 532–33 (Iowa 1995); and Glenn E. Smith, *Understanding the Tort of Third-Party Bad Faith in Wyoming: Western Casualty & Surety Company v. Fowler Revisited*, XXVI Land and Water L.Rev. 635, 688–90 (1991). *See also Lopez v. Arryo*, 489 P.2d 626, 627–29 (Wyo.1971).

[¶ 23] In support of its argument on this issue, Gainsco points to the specific policy language that limits its obligation to pay only "those sums that the insured becomes legally obligated to pay as damages. . . ." The contention is that the covenant not to execute, combined with the agreement to look only to Gainsco for recovery, leads to the inescapable conclusion that Andrews was not "legally obligated to pay" anything.

[¶ 24] The phrase "legally obligated to pay" is not defined in the policy. Some courts have concluded that the term is ambiguous and have, therefore, construed it in favor of the insured. *Red Giant Oil Co.*, 528 N.W.2d at 533. This strict construction, coupled with the holding that a covenant not to execute is merely an agreement and not a release from liability, means that the insured should still be considered legally obligated to pay the stipulated judgment. *Id.* The rationale of this approach is that an insurer who has abandoned the insured by refusing to defend a claim should not be allowed to "hide behind" the policy language. *Coblentz v. American Sur. Co. of New York*, 416 F.2d 1059, 1062–63 (5th Cir.1969); *Losser v. Atlanta Intern. Ins. Co.*, 615 F.Supp. 58, 61 (D.Utah 1985); *American Family Mut. Ins. Co. v. Kivela*, 408 N.E.2d 805, 813 (Ind.App. 1980); *Metcalf v. Hartford Acc. & Indem.*

---

2. The policy limit in *Spangler* was $500,000.00 and the settlement was for $450,000.00. *Spangler*, 881 F.Supp. at 541. Consequently, *Spangler* does not address the issue of the insurer's liability for amounts in excess of policy limits.

*Co.,* 176 Neb. 468, 126 N.W.2d 471, 475–76 (1964).

[¶ 25] Not all courts agree with this view. Some courts hold that an insured protected by a covenant not to execute "has no compelling obligation to pay any sum to the injured party," so neither does the insurer. *Freeman v. Schmidt Real Estate & Ins., Inc.,* 755 F.2d 135, 138 (8th Cir.1985); *Roach v. Ravenstein's Estate,* 326 F.Supp. 830, 836 (S.D.Iowa 1971). The courts that follow this line of reasoning do so out of fear of collusion between the insured and the claimant or by simple reliance on the policy language. *Freeman,* 755 F.2d at 138–39; *Bendall v. White,* 511 F.Supp. 793, 795 (N.D.Ala.1981); *Steil v. Florida Physicians' Ins. Reciprocal,* 448 So.2d 589, 592 (Fla.App.1984); *American Cas. Co. of Reading, Pa. v. Griffith,* 107 Ga.App. 224, 227, 129 S.E.2d 549, 551–52 (1963); *Huffman v. Peerless Ins. Co.,* 17 N.C.App. 292, 293, 193 S.E.2d 773, 774, *cert. denied,* 283 N.C. 257, 195 S.E.2d 689 (1973); *Stubblefield v. St. Paul Fire & Marine Ins. Co.,* 267 Or. 397, 400, 517 P.2d 262, 264 (1973).

[¶ 26] We agree with the rationale of *Spangler* and those cases that find that the inclusion of a covenant not to execute in the settlement agreement between an insured and a claimant, under the circumstances of the case now before us, does not act to negate the fact that a judgment has been entered against the insured and, therefore, does not bar the claimant, as assignee of the insured, from pursuing a claim against the insurer for third-party bad faith. The existence of the judgment, with or without a covenant not to execute, is a detriment to the insured sufficient to support an assignable tort claim. Public policy favors this result in that it allows an insured to reach a reasonable settlement of a case being defended under a reservation of rights and it discourages an insurer from rejecting a reasonable settlement offer. The insurer is adequately protected by the requirement that such settlements be reasonable and by its ability to raise the issues of fraud and collusion.

**Issue No. 2: Did the district court err as a matter of law when it held that Gainsco's rejection of Amoco's settlement offers amounted to third-party bad faith, because, under *Western Cas. & Sur. Co. v. Fowler,* 390 P.2d 602 (Wyo. 1964), there could be no bad faith because Amoco's recovery against Andrews could not, as a matter of law, exceed the limits of Andrews' policy with Gainsco?**

[¶ 27] Gainsco's second argument is similar to its first in that it is premised on the contention that Andrews' third-party bad faith claim, as assigned to Amoco, must fail for a lack of damages. The argument here is that Amoco could never have recovered from Andrews more than the policy limits, so there was no risk to Andrews of an excess judgment.

[¶ 28] An insurer's rejection of a settlement offer within policy limits does not constitute third-party bad faith when the insurer has a bona fide belief that the claimant's recovery will not exceed policy limits. *Fowler,* 390 P.2d at 606.[3] Gainsco argues that, under the contract, Amoco's indemnity claim was expressly limited to the amount of insurance coverage:

> 10. . . . The liability assumed by [Andrews] pursuant to this clause shall be limited to the amounts carried by [Andrews'] current liability insurance. . . .

[¶ 29] We must keep in mind that we "do not look to an insurance company's subjective belief about the claim . . . [but] at its actions objectively at the time it decided to reject the offer of settlement within policy limits." *Winsor,* 5 F.Supp.2d at 1266. In that light, the question is whether Gainsco acted in objective good faith when, with a policy limit of $300,000.00, and with its insurer exposed to a maximum risk of $300,000.00, it rejected a settlement offer of $297,000.00.

[¶ 30] Amoco's response to Gainsco's argument on this issue is not convincing.

---

3. Indeed, the existence of an excess judgment is a required element of the tort of third-party bad faith. In *Jarvis,* 948 P.2d at 900–01, we resisted

an invitation to extend third-party bad faith to situations in which an excess judgment does not exist.

Amoco contends that Gainsco did not have a bona fide belief that Amoco's recovery would not exceed policy limits because (1) the judgment did, in fact, exceed policy limits; (2) Gainsco warned Andrews early on that Andrews might have some personal liability; (3) Gainsco did not raise the indemnity limitation argument in a pleading or motion; and (4) Gainsco did not appeal the judgment. Even if some or all of these allegations are true, however, they miss the point. To begin with, third-party bad faith occurs, if at all, when the offer of settlement is rejected. The central element of a tort of third-party bad faith is the objectively unreasonable rejection of a settlement offer within policy limits. Application of that standard in the instant case leads to the inescapable conclusion that rejection of the $297,000.00 settlement offer was not objectively unreasonable because, with Andrews' contractual obligation limited to $300,000.00, there was no reasonable risk of an excess judgment.

[¶ 31] The Contract's provisions were before the district court when summary judgment was granted to Amoco in an amount grossly in excess of the contractual obligation. Both the indemnity obligation and the limitation on that obligation were unambiguous. Had they been ambiguous, the rules of construction require the court to construe contracts so as to give meaning to all terms. *Moncrief v. Louisiana Land and Exploration Co.*, 861 P.2d 516, 524 (Wyo. 1993). Here, it was error for the district court to give meaning to the indemnity obligation of paragraph 10 without also giving meaning to the limitation thereon contained in the same paragraph. Thus, it was also error for the district court to grant summary judgment to Amoco on its third-party bad faith claim because Gainsco had a bona fide belief, under an objective standard, that there could be no excess judgment.

**Issue No. 3: Did the district court err as a matter of law when it held that Gainsco's denial of coverage to Andrews amounted to first-party bad faith, because the total pollution exclusion made the question of coverage debatable?**

[¶ 32] To reiterate, first-party bad faith occurs when an insurer, in bad faith, refuses to pay an insured's direct claim for policy benefits. First-party bad faith is the knowing or reckless denial of a claim without a reasonable basis for such denial. Under an objective standard, the question is whether the validity of the claim is fairly debatable. Such validity is fairly debatable if a reasonable insurer would have denied or delayed payment of benefits under the existing circumstances.

[¶ 33] "The logical premise of the debatable ... standard is that if a realistic question of liability does exist, the insurance carrier is entitled to reasonably pursue that debate without exposure to a claim of violation of its duty of good faith and fair dealing." *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855, 860 (Wyo.1990). Also implicated is the question of "'whether the facts necessary to evaluate the claim are properly investigated and developed or recklessly ignored and disregarded.'" *Id.* (*quoting Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368, 376–77 (1978)).

[¶ 34] In the instant case, the precise issue is if it was fairly debatable whether the pollution exclusion in the insurance policy meant Gainsco had not provided coverage for Abraham's death from exposure to hydrogen sulfide gas. Neither of Wyoming's two published opinions dealing with the pollution exclusion are helpful in answering this question. *See Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535, 540–43 (Wyo.1996) (meaning of "sudden and accidental" in exception to pollution exclusion) and *Compass Ins. Co. v. Cravens, Dargan and Co.*, 748 P.2d 724, 727–28 (Wyo.1988) (meaning of "property damage" and "occurrence"). Nationwide, however, there appear to be dozens of cases that have addressed this issue.

[¶ 35] The pollution exclusion has been around, in one form or another, since the early 1970's. *American States Ins. Co. v. Koloms*, 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 77 (1997). The present version of the exclusion, known as the "total" or "absolute" pollution exclusion, was drafted in 1985. *Id.* As might be expected, both Amoco and Gainsco have cited cases from other jurisdic-

tions supporting their respective interpretations of the exclusion and its applicability to the facts of this case. We will not attempt to review all those cases, but we will mention two that are representative of the contrasting positions.

[¶ 36] In *Bernhardt v. Hartford Fire Ins. Co.*, 102 Md.App. 45, 648 A.2d 1047, 1049–52 (1994), *cert. granted*, 337 Md. 641, 655 A.2d 400, *cert. dismissed*, 338 Md. 415, 659 A.2d 296 (1995), the Maryland Court of Special Appeals found that (1) the total pollution exclusion was not ambiguous; (2) it was not limited solely to incidents of industrial pollution; and (3) it applied to preclude coverage for injuries resulting from the accumulation of carbon monoxide gas due to obstructions in an apartment building's chimney flue. To the contrary, in *Koloms*, 227 Ill.Dec. 149, 687 N.E.2d at 75–82, the Supreme Court of Illinois pointedly rejected the reasoning of *Bernhardt* and concluded that the total pollution exclusion was intended to apply only to "those injuries caused by traditional environmental pollution." *Id.* at 82.

[¶ 37] In the context of this split in authority, it is probably not surprising that the parties' experts in the present case disagreed as to whether the question of coverage was fairly debatable. We must remember that, for purposes of the issue at hand, asking that question is not the same as asking whether there actually was coverage under the policy.[4] Undoubtedly, the language of the exclusion could, on its face, be applied to the accidental release of a poisonous gas.[5] For that reason, and given the disparity of authority nationwide on this question, we conclude that Gainsco had a reasonable basis for its original denial of coverage. Stated differently, it is not necessarily an act of bad faith for an insurer to deny or delay payment of benefits where the underlying incident objectively may be seen as being covered by a policy exclusion, particularly where there is no controlling authority within the jurisdiction.

**Issue No. 4: Did the district court err as a matter of law when it held that Gainsco's denial of coverage to Andrews amounted to first-party bad faith, because the insured contract exclusion made the question of coverage fairly debatable?**

[¶ 38] Gainsco's policy insured Andrews against contractually assumed tort liability. The present issue arises out of Gainsco's inclusion in the policy of the following language, drafted by Gainsco's product manager and included in no other insurer's policy:

> **However, this insurance does not apply to that part of any contract or agreement that indemnifies any person or organization for the indemnitee's sole tort liability.**

(Emphasis in original.) It is Gainsco's position that the phrase, "the indemnitee's sole tort liability," excludes from coverage those contracts wherein its insured agrees to indemnify the other contracting party in situations where the insured, himself, is not liable. In other words, Gainsco contends that the word "sole" does not mean the other party is the sole tortfeasor; rather, it means that, as between the other party and the insured, the other party is the only tortfeasor.

[¶ 39] Amoco characterizes Gainsco's logic on this issue as a "jump[ ] off the coverage analysis cliff into the netherworld of absurd contract interpretation." The deposition testimony of Dudley Watts, a Gainsco claims examiner, as to the meaning of the quoted policy language, illustrates the Gainsco policy interpretation that Amoco finds offensive:

> Q. My question is: What is the language in that bold sentence that tells you that this is not an insured contract?
>
> A. There was no negligence on the part of my insured.
>
> Q. Is that the only thing in that bold sentence that would suggest to you that there is no coverage here, there's no insured contract here?

---

4. The latter question is the subject of the fifth issue in this appeal.

5. "This insurance does not apply to ... 'bodily injury' ... which would not have occurred ... but for the ... release ... of ... any ... gaseous ... irritant or contaminant...."

A. That's what it says.

. . .

Q. Have you made either determination?

A. I made a determination that the insured was not negligent in the death of Abraham.

Q. Have you made any other factual determinations like that, as to whether anybody else in the whole world was negligent, as relates to this death of Mr. Abraham?

A. I found no negligence on the part of Andrews. That's all that was required.

. . .

Q. The question is: If you were the one making the coverage call or decision in this case, looking at that bold sentence, would you focus on whether Mr. Andrews was negligent or would you focus on whether Amoco was negligent, or would you focus on whether both of them were negligent?

A. I would focus on whether or not my insured was negligent.

Q. And that is all?

A. If—yeah. And if my insured is not negligent, then the sole negligence, then the sole indemnitee—sole negligence lies elsewhere.

[¶ 40] Amoco argues that Gainsco was unreasonable when interpreting "sole tort liability," in focusing on Andrews' liability, and that it was unreasonable because the liability of the insured is not even mentioned in the sentence. While that conclusion may be easy to draw, Gainsco did provide some rationale for its position. Amoco also deposed Glenda Bruton, Gainsco's product manager and the person who drafted the questioned language. She gave the following testimony:

Q. What are your memories of how you came up with that particular language in the bolded sentence?

A. The intent was to provide intermediate contractual liability coverage for written contracts.

. . .

Q. Tell me what intermediate contractual liability coverage is to you?

A. That means the—you have a sole or joint negligence of the insured in connection with the contract that they have with the indemnity [sic]. It's between the indemnity [sic] and the insured. It has to be either sole or joint negligence on the part of the insured.

[¶ 41] Clearly, Gainsco's intent was that its policy would not cover its insured's contractual indemnity obligations unless the insured was himself also separately liable. When this subjective intent is considered, it may be said that Gainsco acted in subjective good faith in declining coverage. The problem is that the standard for first-party bad faith is objective, not subjective.

[¶ 42] We conclude that a reasonable insurer would not have denied coverage based on the insured contract exclusion. The issue of coverage was not fairly debatable because the exclusion simply does not limit coverage to those situations where the insured is separately liable. Consequently, Gainsco's reliance on its subjective interpretation of the policy was not reasonable.

**Issue No. 5: Did the district court err as a matter of law when it held that Amoco's indemnity claim was covered under Andrews' policy with Gainsco, when the total pollution exclusion showed no coverage existed?**

[¶ 43] This issue, of course, follows closely on the heels of the third issue discussed above. In that discussion, we concluded that Gainsco had not acted in bad faith by denying coverage pursuant to the total pollution exclusion in its policy. We now must address whether Gainsco was right. The question, as it has been defined by the parties and in numerous cases across the country, is whether the pollution exclusion is narrowly limited to the concept of environmental pollution or whether it also excludes coverage for personal injuries caused by irritants and contaminants under circumstances such as exist in the instant case.

[¶ 44] In arguing that the pollution exclusion forecloses coverage in situations such as the one in the instant case, Gainsco points

out that the exclusion does not in direct language limit itself to environmental pollution. A close reading of the exclusion reveals that Gainsco is correct. Gainsco also directs us to numerous cases wherein the pollution exclusion has been found to bar coverage for losses similar to Abraham's death from hydrogen sulfide gas. *See, e.g., Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 901 (3rd Cir. 1997) (exclusion does not require release of pollutant to the atmosphere and does not limit itself to environmental catastrophes); *American States Ins. Co. v. Nethery*, 79 F.3d 473, 475–78 (5th Cir.1996) (pollution exclusion encompasses more than traditional conceptions of pollution); *Toledo v. Van Waters & Rogers, Inc.*, 92 F.Supp.2d 44, 51–52 (D.R.I. 2000) (plain and ordinary meaning of language of pollution exclusion precludes coverage even for non-environmental pollution); *American States Ins. Co. v. Technical Surfacing, Inc.*, 50 F.Supp.2d 888, 889–90 (D.Minn.1999) (pollution exclusion not limited to environmental or outdoor pollution); *Brown v. American Motorists Ins. Co.*, 930 F.Supp. 207, 208–09 (E.D.Pa.1996), *aff'd*, 111 F.3d 125 (3rd Cir.), *cert. denied*, 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997) (clear and unambiguous policy language shows no intent to limit pollution exclusion to environmental pollution); *TerraMatrix, Inc. v. United States Fire Ins. Co.*, 939 P.2d 483, 488 (Colo.App.1997) (plain language of pollution exclusion not limited to environmental or industrial pollution); *Lititz Mut. Ins. Co. v. Steely*, 746 A.2d 607, 612–13 (Pa.Super.1999), *rev'd on other grounds*, 567 Pa. 98, 785 A.2d 975 (2001) (pollution exclusion not limited to environmental pollution); *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 105 (1999) (no language in pollution exclusion limits its application to environmental pollution); and *Cook v. Evanson*, 83 Wash.App. 149, 920 P.2d 1223, 1226–27 (1996) (pollution exclusion not limited to classic environmental pollution).

[¶ 45] Many courts have come to a conclusion on this issue directly contrary to the holdings of the above-cited cases. *See, e.g., Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 31 (1st Cir.1999) (reasonable interpretation of exclusion is that it applies only to environmental pollution); *Enron Oil Trading &*

*Transp. Co. v. Walbrook Ins. Co., Ltd.*, 132 F.3d 526, 530 (9th Cir.1997) (exclusion's reference to "seepage, pollution and contamination" indicates environmental-type harm); *Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir.1992) (literal interpretation of pollution exclusion's terms would be overbroad and would render judicial limitations on insurance policies meaningless); *Keggi v. Northbrook Property and Cas. Ins. Co.*, 199 Ariz. 43, 13 P.3d 785, 791 (2000) (exclusion intended only to exclude coverage for traditional environmental pollution); *Koloms*, 227 Ill.Dec. 149, 687 N.E.2d at 81 (pollution exclusion does not apply to "toxic torts" but is restricted to instances of classic pollution such as groundwater or soil contamination from industrial operations); *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 680–82 (Ky.App.1996) (total pollution exclusion uses terminology from environmental law and the historical objective of the exclusion was to avoid coverage for environmental catastrophes); *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 135 (La.2000), *corrected*, 782 So.2d 573 (La.2001) (absolute pollution exclusion not intended to exclude coverage for all interactions with irritants or contaminants and should be construed to exclude coverage only for environmental pollution); *Atlantic Mut. Ins. Co. v. McFadden*, 413 Mass. 90, 595 N.E.2d 762, 764 (1992) (pollution exclusion's terms are terms of art in environmental law); *Weaver v. Royal Ins. Co. of America*, 140 N.H. 780, 674 A.2d 975, 977 (1996) (where phrase "discharge, dispersal, release or escape" was not defined, it should be construed against the insurer); *Karroll v. Atomergic Chemetals Corp.*, 194 A.D.2d 715, 600 N.Y.S.2d 101, 102 (1993) (exclusion reasonably interpreted to apply only to environmental pollution); *West American Ins. Co. v. Tufco Flooring East, Inc.*, 104 N.C.App. 312, 409 S.E.2d 692, 699 (1991), *overruled on other grounds by Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 524 S.E.2d 558 (2000) (terms such as "discharge, dispersal, release, or escape" are environmental terms of art meant to apply to environmental pollution); and *Kent Farms, Inc. v. Zurich Ins. Co.*, 93 Wash.App. 414, 969 P.2d 109, 111–12 (1998), *aff'd*, 140 Wash.2d

396, 998 P.2d 292 (2000) (reasonable reading of the exclusion limits it to traditional environmental damages).

[¶ 46] In light of this conflict in authority as to the intent and scope of the total pollution exclusion, it is helpful to consider its original purpose. The pollution exclusion had its inception in the 1970's in response to federal and state legislation mandating responsibility for the cleanup costs of environmental pollution. 9 *Couch on Insurance* 3d § 127:3 (1997). The purpose of the current version of the exclusion remains to exclude these governmentally mandated cleanup costs. *Koloms*, 227 Ill.Dec. 149, 687 N.E.2d at 81–82. To read the exclusion more broadly ignores the insurers' objective in creating the exclusion and ignores the general coverage provisions of the policy. *Kent Farms, Inc. v. Zurich Ins. Co.*, 140 Wash.2d 396, 998 P.2d 292, 295 (2000).

[¶ 47] We interpret insurance policies just as we interpret other contracts, except that words used in an insurance policy are given the plain meaning that a person in the position of the insured would understand them to mean. *Doctors' Co.*, 864 P.2d at 1023. We cannot believe that any person in the position of the insured would understand the word "pollution" in this exclusion to mean anything other than environmental pollution. In a footnote in its decision letter, the district court concisely pinpointed what is wrong with Gainsco's argument:

> In other words, the [*Koloms*] Court invites us to consider the ordinary meaning [of] the term, "pollution." We might simply ask in this context, "Was the incident in this case an instance of pollution?" Or, to get into the context of the total pollution exclusion clause, "Was Abraham's death caused by pollution?" Ordinary usage of the term tells us this was not an instance of pollution, and Abraham's death was not caused by pollution.

[¶ 48] We do not know if it is the majority position, but we will join with those courts that have held the total pollution exclusion to be limited to the concept of environmental pollution. The district court did not err as a matter of law when it held that Amoco's

indemnity claim was covered under Andrews' policy.

**Issue No. 6: Did the district court err as a matter of law when it held that Amoco's indemnity claim was covered under Andrews' policy with Gainsco, when the insured contract exclusion showed no coverage existed?**

[¶ 49] We have already answered this question in the negative with our above analysis of the fourth issue. Nothing in the language of the insured contract exclusion justified Gainsco's denial of coverage. The phrase "indemnitee's sole tort liability" is ambiguous and must be construed against Gainsco, who drafted the policy. *Shoshone First Bank v. Pacific Employers Ins. Co.*, 2 P.3d 510, 513 (Wyo.2000). It may be conceivable that the phrase was meant to say what Gainsco says it means—that "sole" means there is no coverage if the insured is not also liable—but the more likely meaning, given that the insured is not even mentioned, and the meaning more favorable to the insured, is that insured contracts do not include those where the proposed indemnitee is 100% at fault. In the instant case, no one contended that Amoco was 100% at fault, so the contract indemnifying Amoco was an insured contract.

**Issue No. 7: Did the district court err as a matter of law when it ignored Gainsco's argument that it was prejudiced when Amoco and Andrews failed to notify it that one term of the settlement agreement was Andrews' dismissal of its third-party complaint against Kobbe?**

[¶ 50] A brief review of the factual and procedural history of this case will help set the stage for a discussion of this issue. At the time of the incident that resulted in his death, Abraham was employed by Andrews' subcontractor, Kobbe, at Amoco's Elk Basin Oil Field. The Abraham Estate sued Amoco, Andrews, and Kobbe for wrongful death. Andrews obtained summary judgment based on a finding of no duty, and the claim against Kobbe was dismissed due to worker's compensation immunity. Amoco

settled for $650,000.00. Amoco then sued Andrews for contractual indemnity. Andrews, defended by Gainsco, brought a third-party complaint against Kobbe alleging equitable implied indemnity.

[¶ 51] Because Gainsco defended Andrews under a reservation of rights, Andrews obtained separate counsel. After considerable negotiation, Amoco and Andrews reached a settlement. On May 10, 1995, Andrews' counsel sent a letter to Gainsco outlining the proposed settlement and offering Gainsco a final opportunity to settle the matter itself. The May 10th letter indicated only three settlement terms: a judgment against Andrews, a covenant not to execute against Andrews personally, and an assignment to Amoco of Andrews' rights against Gainsco. Gainsco declined to participate in the settlement.

[¶ 52] The present issue arose because the final settlement reached between Amoco and Andrews contained a fourth term, that being Andrews' agreement to dismiss with prejudice its third-party complaint against Kobbe. Gainsco now claims it was prejudiced because it had no notice that the settlement would extinguish its ability to proceed against Kobbe.[6]

[¶ 53] Gainsco concedes that an insured does not violate the cooperation clause of an insurance policy by settling a claim being defended under a reservation of rights, so long as such settlement is preceded by adequate notice to the insurer. *Spangler,* 881 F.Supp. at 545. Notice is not a separate procedural requirement imposed by the courts, but is part of the factual question of whether the settlement was reasonable, in good faith, and without collusion. *Id.* Gainsco further contends that such a settlement must not prejudice the rights of the insurer. *Ideal Mut. Ins. Co. v. Myers,* 789 F.2d 1196, 1203 (5th Cir.1986). An insurer is prejudiced when it is deprived of a valid defense. *Id.* If such prejudice does occur, the insurer is

discharged from its obligations under the policy. *Id.* There is a rebuttable presumption of prejudice where the insured has failed to show substantial compliance with a condition precedent to coverage. *Simpson v. United States Fidelity & Guar. Co.,* 562 N.W.2d 627, 631 (Iowa 1997).

[¶ 54] Gainsco's third-party complaint against Kobbe sought indemnification. The general rule of indemnity, taken from the Restatement of Restitution § 76 (1937), has been stated by this Court as follows:

> "A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct."

*Schneider Nat., Inc. v. Holland Hitch Co.,* 843 P.2d 561, 572 (Wyo.1992).

[¶ 55] There are three classifications of indemnity: (1) express indemnity resulting from the specific language of a contract; (2) implied contractual indemnity, also known as implied in fact indemnity, that arises from the contractual or legal relationship implied between the parties; and (3) equitable implied indemnity, also known as implied in law indemnity or common law indemnity, that is created by a relationship implied in law. *Id.* at 573. In its third-party complaint, Gainsco alleged equitable implied indemnity, but both equitable implied indemnity and implied contractual indemnity have been argued in this appeal.

[¶ 56] Gainsco begins its argument by pointing out that, in *Abraham,* 893 P.2d at 1157, this Court determined that Andrews and Kobbe had entered into an oral contract whereby Kobbe was to perform Andrews' obligations under its contract with Amoco. Therefore, the parties had the necessary relationship to create an indemnity duty. Further, since Andrews had no duty to Abraham,

---

**6.** The May 10th letter from Andrews' counsel to Amoco certainly was not the only communication from Andrews and Amoco asking Gainsco to participate in the settlement. It was, however, the final such communication, and it spelled out the supposed terms upon which the settlement was to be reached. While the May 10th letter is, therefore, the most material in determining whether Gainsco was given reasonable notice of the settlement terms, it should also be noted that the record does not reveal any other communication to Gainsco in which dismissal of the third-party action against Kobbe was proposed.

any liability imposed upon Andrews could only be vicarious liability for the conduct of Kobbe. Therefore, Gainsco argues, any payment by Andrews would be the discharge of a duty ultimately owed by Kobbe.[7]

[¶ 57] Amoco sees a fatal flaw in Gainsco's reasoning: because its implied indemnity argument was never viable, Gainsco was not prejudiced by its dismissal. As Abraham's employer, Kobbe was immune from liability in the wrongful death suit under the worker's compensation act. Wyo. Stat. Ann. § 27–14–104 (LexisNexis 2001) (formerly Wyo. Stat. Ann. § 27–12–103 (1977 Republ. Ed.)). Kobbe's tort liability to Abraham, if any, had been replaced by its statutory obligations under the worker's compensation scheme:

> "The great majority of jurisdictions have held that the employer whose concurring negligence contributed to the employee's injury cannot be sued or be joined by the third party as a joint tortfeasor, whether under contribution statutes or at common law. The ground is a simple one: the employer is not jointly liable to the employee in tort."

*Cities Service Co. v. Northern Production Co., Inc.,* 705 P.2d 321, 325 (Wyo.1985) (*quoting* 2A Larson, *The Law of Workmen's Compensation* § 76.20). Amoco contends next that only by an express contract providing for indemnity may an employer be seen to have contracted away this protection. *Cities Service Co.,* 705 P.2d at 325–26. Amoco concludes that, because no such express contract between Andrews and Kobbe existed in this case, Andrews may not sue Kobbe.

[¶ 58] In *Pan American Petroleum Corp. v. Maddux Well Service,* 586 P.2d 1220, 1224 (Wyo.1978), this Court held that the Worker's Compensation Act does not bar third-party claims based upon express contractual indemnity, but we declined to say whether that principle also applies to implied indemnity:

> We hold that the Worker's Compensation provisions do not bar third-party claims for indemnity. The trial court,

therefore, erred with respect to the general legal principles to be applied to Maddux's motion for summary judgment.

As noted previously, the courts of some jurisdictions have based their decisions on the exclusivity issue on the type of indemnity sought. In this case, the parties appear to concede that if Worker's Compensation is not a bar to indemnity based on an express contract, then it is not a bar to claims based on an implied indemnity or on common-law indemnity. As is the case with the issue of contribution, we have, therefore, no occasion in this opinion to decide whether or not causes of action had on implied indemnity or common-law indemnity would be precluded by the Worker's Compensation Act. That inquiry must await a case that squarely presents these last-mentioned issues.

[¶ 59] In 1982, the United States District Court for the District of Colorado, applying Wyoming law, did answer this specific question. *See Forward v. Cotton Petroleum Corp.,* 540 F.Supp. 122 (D.Colo. 1982). Relying on *Maddux Well Service's* broad statement that the worker's compensation statutes " 'do not bar third-party claims for indemnity,' " and upon its own conclusion that *Maddux Well Service,* despite the above-quoted disclaimer, had actually "held that implied indemnity actions are not precluded by workmen's compensation," the court in *Forward* held that third-party implied indemnity actions are not barred by worker's compensation immunity. *Forward,* 540 F.Supp. at 124–25.

[¶ 60] It is important in this discussion to keep in mind the distinction between liability in tort and liability for indemnity. In *Cities Service Co.,* 705 P.2d at 325, we pointed out that an action for contribution from a joint tortfeasor is not like an indemnity action. The former is based on the injury to the employee while the latter is based on the independent relationship between the employer and the third party. *Maddux Well Service,* 586 P.2d at 1224. Worker's compen-

---

7. While this theory may be true as far as it goes, it applies only to whatever liability may have been imposed upon Kobbe. It does not consider any of Amoco's liability that Andrews may have assumed under the contract's indemnity provision.

sation immunity is part of the trade-off of rights and liabilities between employer and employee and it does not involve third parties who have not benefited from the arrangement. *Id.; Cities Service Co.,* 705 P.2d at 324. That is why worker's compensation immunity does not protect employers from indemnity actions brought by those third parties.

[¶ 61] The oral contract between Andrews and Kobbe did not contain an express indemnity provision. However, we have been shown nothing that convinces us to distinguish between express contractual indemnity and implied indemnity in this situation. In previous opinions, we have concluded that indemnity, in all its forms, survived repeal of joint and several liability and the contribution statutes, and adoption of comparative negligence. *Diamond Surface, Inc. v. Cleveland,* 963 P.2d 996, 1002 (Wyo.1998); *Schneider Nat., Inc.,* 843 P.2d at 565–80. In consonance with the comparative fault concept, we have also limited the indemnitee's recovery from the indemnitor to that portion of the damages caused by the indemnitor's breach of his separate duty to the indemnitee. *Diamond Surface, Inc.,* 963 P.2d at 1002–03; *Schneider Nat., Inc.,* 843 P.2d at 578. Indemnity does, after all, have its roots in the equitable principles of restitution and unjust enrichment. *Schneider Nat., Inc.,* 843 P.2d at 578. The underlying public policy is simple fairness:

> Indemnity actions are merely part of "a rich expositional· refinement of the principle of fairness" in which "we each promise all others that we will be liable for the damage which our own negligence in the undertaking has caused." *Missouri Pac. R. Co. [v. Whitehead & Kales Co.],* 566 S.W.2d [466] at 468–69, 469 n. 4 [ (Mo. 1978) ].

*Schneider Nat., Inc.,* 843 P.2d at 577. Surely, that public policy is realized as much by allowing an implied indemnity claim in the face of the worker's compensation bar as it is by allowing an express indemnity claim in the same situation.

[¶ 62] In the instant case, Kobbe's independent duty to Andrews, arising out of the oral contract, was to perform work under the contract in a workmanlike fashion. If Kobbe violated that duty to Andrews through some act of negligence, which act resulted in Abraham's death, and Andrews became liable for those damages, Kobbe should indemnify Andrews for Kobbe's share of the fault. As a question of fairness, it makes no difference that Kobbe's obligation arose impliedly out of the contractual relationship rather than by express agreement. We hold that worker's compensation immunity does not bar third-party claims based upon implied indemnity.

[¶ 63] The next question is whether Gainsco was prejudiced by dismissal of the third-party complaint against Kobbe. Gainsco, representing Andrews, sought indemnity from Kobbe for whatever portion of the eventual damages that might be attributed to Kobbe's negligence. The settlement between Amoco and Andrews stated that "in the face of a likelihood of being exposed to a large verdict," Amoco had settled with the Abraham Estate. There is no explanation why Amoco required dismissal of Andrews' claim against Kobbe, and the settlement agreement does not express an intention that the payment was partially to cover Kobbe's share of the fault.[8] Yet, the settlement between Amoco and Andrews clearly extinguished Gainsco's ability not only to pursue Kobbe for indemnity, but even to determine what percentage of fault, if any, might be Kobbe's.

[¶ 64] This issue was raised directly by Gainsco in its motion for summary judgment, but it was ignored in the district court's decision letter. In fact, the district court made the erroneous assertion that "GAINSCO was fully informed at every step of the actions that followed." The district court noted specifically that Amoco would not likely have been apportioned 100% of the fault in this case, and that Kobbe, through Abraham's conduct, probably would also be found

---

8. One possible explanation is the fact that Ray Kobbe, who operated Kobbe Construction, was the brother of Randy Kobbe, who was a supervisor for Amoco in the Elk Basin Oil Field. Amoco had contracted with Andrews as a straw man to avoid its anti-nepotism policy. *Abraham,* 893 P.2d at 1157.

at fault. But the district court never went on to recognize that the Abraham/Kobbe fault was the cornerstone of Gainsco's implied indemnity argument. Gainsco is certainly correct in its assertion that, had the third-party complaint not been dismissed, Gainsco could have pursued Kobbe for indemnity. Gainsco was prejudiced by the settlement between Amoco and Andrews.

### Issue No. 8: Did the district court err as a matter of law when it held that the stipulated judgment amount of $795,901.00 was a reasonable amount?

[¶ 65] Amoco settled the Abraham Estate's wrongful death action for $650,000.00. Interest, costs and attorneys' fees brought the amount up to $795,901.00 in Amoco's stipulated judgment against Andrews. By the time the district court granted Amoco judgment against Gainsco, the figure was $1,299,501.00. At issue here is the reasonableness of the second figure—the amount of the settlement between Amoco and Andrews.

[¶ 66] In their settlement agreement, Amoco and Andrews recited numerous facts that suggested the possibility of a large judgment in the wrongful death action.[9] Gainsco does not contest the reasonableness of the $650,000.00 Amoco paid to settle that action. The issue, instead, is the reasonableness of Andrews agreeing to entry of a $795,901.00 judgment against it in favor of Amoco when the limit of its indemnity agreement was $300,000.00.[10] Amoco has not contended that Andrews was insured for more than the required $300,000.00 minimum.

[¶ 67] Amoco concedes that an insurer who has rejected an offer to settle within policy limits is liable for a later stipulated judgment only if the amount of that judgment is reasonable. See Spangler, 881 F.Supp. at 545–46. Amoco then goes on to defend the reasonableness of its settlement with the Abraham Estate. That, of course, is not the question. The question is the reasonableness of the settlement in the later suit

by Amoco against Andrews, in which Andrews not only agreed to a judgment over twice the amount of the risk, but also agreed to dismissal of its cause of action against Kobbe.

[¶ 68] There are many views as to who has the burden of proving that a settlement was reasonable, and what proof is required. In Arizona, the test as to whether a settlement was reasonable is what a reasonably prudent person in the insured's position would have settled for on the merits of the claimant's case. *United Services Auto. Ass'n v. Morris,* 154 Ariz. 113, 741 P.2d 246, 254 (1987). A similar statement of the insured's obligation is that "[t]he insured must demonstrate only that, in settling, his conduct conformed to the standard of a prudent uninsured." *Myers,* 789 F.2d at 1200. In deciding whether a settlement was reasonable, the reviewing court may determine whether it is "on its face unconscionable . . . ." *Losser,* 615 F.Supp. at 61. Another factor is whether the insured made any effort to minimize his liability. *Taylor v. Safeco Ins. Co.,* 361 So.2d 743, 746 (Fla.App. 1978).

[¶ 69] Where the insurer has both denied coverage and wrongfully refused to defend, some courts find that a presumption of validity has been created as to the settlement agreement. "The settlement agreement is 'presumptive evidence' of the insured's liability. . . . [The insurer is obligated to] come forward with evidence that the settlement was not a good faith resolution of the claims . . . but [was] the product of collusion or bad faith." *Shawnee Auto Service Center, Ltd. v. Continental Cas. Co.,* 782 F.Supp. 1503, 1506 (D.Kan.1992). Even where this presumption arises, however, the claimant may bear some of the burden of proof:

When the insurer has wrongfully refused to defend and the insured reaches a settlement with the injured party, most courts have held that a settlement is presumptive evidence of the liability of the

---

9. Abraham had been married for five years. At the time of his death, his wife was expecting their first child. Abraham also had a large close-knit extended family, with many claimants.

10. See paragraphs 10 and 11(b) of the Contract.

insured and the amount of damages. In addition, the insurer has the burden of rebutting this presumption by showing the settlement was procured as a result of fraud or collusion. . . .

. . .

We hold therefore that in settlements like the one here, an insurer, relying on fraud or collusion, must plead and prove these defenses. If either defense is proven, the settlement is invalid and unenforceable against the insurer. The injured party, however, has the burden to prove by a preponderance of the evidence that (1) the underlying claim was covered by the policy, and (2) the settlement which resulted in the judgment was reasonable and prudent. The test the fact finder must apply on this issue is what a reasonable and prudent person in the position of the defendant (Coyle) would have paid to settle the plaintiff's (Red Giant's) claim. In applying this test, the fact finder must consider facts bearing on the liability and damage aspects of the claim as well as the risks of going to trial.

The fraud and collusion issues are fact questions and so are the issues of reasonableness and prudence. Here none of these issues were established as a matter of law. They are material issues of fact and therefore not subject to summary judgment determination.

*Red Giant Oil Co.,* 528 N.W.2d at 534–35. The holding in *Red Giant Oil Co.* was based on an earlier Minnesota case, *Miller v. Shugart,* 316 N.W.2d 729 (Minn.1982). In *Miller,* the court considered the circumstances under which the claimant should bear the burden of proving the reasonableness of a stipulated judgment:

In these circumstances, while the judgment is binding and valid as between the stipulating parties, it is not conclusive on the insurer. The burden of proof is on the claimant, the plaintiff judgment creditor, to show that the settlement is reasonable and prudent. . . .

It may be instructive to point out how this case differs from *Butler Brothers v. American Fidelity Co.,* 120 Minn. 157, 139 N.W. 355 (1913). In *Butler* we held that a stipulated judgment, while not conclusive on the insurer, was presumptively so, and that the burden was on the insurer to show the settlement was unreasonable. In *Butler,* however, the insured entered into a settlement with the plaintiff in the course of a "real trial" while defending itself after being abandoned by its insurer. Thus the *Butler* settlement had quite different *bona fides* than the settlement made here. Here we think it appropriate, and so hold, that the burden of proving reasonableness is on the plaintiff claimant.

*Miller,* 316 N.W.2d at 735–36. In other words, when the insured and the claimant settle a case that is being defended by the insurer, even under a reservation of rights, the insured and the claimant should bear the burden of proving that the settlement was reasonable. *See Morris,* 741 P.2d at 253. *But see also Kivela,* 408 N.E.2d at 812–13, where a stipulated judgment was held conclusive against an insurer who refused to defend the insured.[11]

■ [¶ 70] We conclude that, as between Amoco and Gainsco, Amoco had the burden of proving that its settlement with Andrews was reasonable. Further, we hold that a settlement in such circumstances is reasonable if a reasonably prudent person in the position of the insured, under all of the relevant circumstances, would have settled on those terms. With that standard in mind, we cannot find that the settlement was reasonable. While the question of the reasonableness of a settlement is a question of fact, there are no genuine issues of material fact in regard to this issue. Despite a contractual limit of $300,000.00, Andrews agreed to a

---

11. In the case of alleged bad-faith failure to settle third-party claims, the insured has, in fact, made its own settlement by the time a bad-faith action comes to fruition. In such a case, the reasonableness of the insured's settlement becomes an element of the claim, and the insured ordinarily bears the burden of establishing this reasonableness, although, by some authority, the reasonableness is presumed from the insurer's breach of the duty to defend, and the insurer must then rebut the presumption.

14 *Couch on Insurance 3d* § 204:39 (1999) (footnote omitted).

judgment for $795,901.00. Despite a potentially valid claim against Kobbe for implied indemnity, Andrews agreed to dismiss that claim with prejudice. Amoco has attempted to justify the dollar amount by emphasizing the validity of the underlying stipulated judgment in favor of the Abraham Estate. However, Amoco's evaluation of the "worth" of the wrongful death claim has little to do with Andrews' failure to evaluate the "worth" of the indemnity claim. Similarly, Amoco has produced no evidence to justify Andrews' agreement to dismiss its claim against Kobbe, an action that undeniably prejudiced Gainsco.

**Issue No. 9: Did the district court err as a matter of law when it held that the total stipulated judgment amount was enforceable by Amoco against Gainsco?**

 [¶ 71] Toward the end of its decision letter, the district court stated its agreement with several "propositions advanced by AMOCO," including the following:

e. GAINSCO's repeated offers of $20,000 to settle a likely liability exposure of well over $700,000 to its insured, when there was applicable coverage, constituted insurance bad faith.

. . .

g. GAINSCO is guilty of bad faith, and thus is liable to AMOCO for its $300,000 policy limit and further for all amounts in excess thereof necessary to satisfy the judgment of $795,901 and post-judgment interest.

[¶ 72] These conclusions were preceded by the district court's analysis that formed the basis for the conclusions:

Having determined that GAINSCO has contractual liability, the final question for consideration by this Court is whether GAINSCO is further guilty of bad faith, such that it is liable for the full amount of the judgment entered against ANDREWS. GAINSCO not only failed to recognize and honor its contractual obligation to ANDREWS, but also issued a reservation of rights letter to ANDREWS. Consequently, ANDREWS faced virtually certain liability to AMOCO far in excess of its coverage provided by GAINSCO. GAINSCO had numerous opportunities to settle, which it persistently rejected. GAINSCO was fully notified of ANDREWS' intentions. Nothing ANDREWS did in the course of negotiations with AMOCO, culminating in the settlement and assignment of [its] cause of action against GAINSCO to AMOCO could possibly be surprising to GAINSCO. GAINSCO was repeatedly notified. GAINSCO chose to reject every opportunity to accept its responsibility, with full knowledge of the resulting exposure to ANDREWS and the obvious resultant necessity for ANDREWS to negotiate a settlement with AMOCO and assign his rights as against GAINSCO to AMOCO, leading to this bad faith action.

The third party bad faith concept is straightforward enough. It is based on the simple proposition that an insurance company, knowing that it has a liability limit in its policy, should not be permitted simply to permit its insured to be exposed to liability far in excess of the coverage limit, when the insurance company had every opportunity to settle for the limit. The temptation must be obvious, if the insurance company can assume that no matter what happens, its liability is limited to the coverage in the policy. This is especially true when a reservation of rights letter is issued. ANDREWS had very few options—either fight it out in Court, facing certain liability far in excess of the policy limit, or negotiate a reasonable settlement and assign the bad faith claim against GAINSCO to AMOCO in return for a covenant not to execute. As a practical matter, ANDREWS had only one viable option, that being the latter. It matters not in this analysis that AMOCO is a huge corporation and not an individual person, nor that ANDREWS is an individual person as opposed to a vast conglomerate.

GAINSCO had a duty to exercise intelligence, good faith, and honest and conscientious fidelity to the common interest of the plaintiff (AMOCO) as well as of the defendant/insured (ANDREWS) and give at least equal consideration to the interest of

ANDREWS. *Jarvis v. Farmers Ins. Exchange,* 948 P.2d 898 (Wyo.1997).

To put this analysis back in to the summary judgment context, AMOCO has offered substantial admissible evidence that the stipulated judgment was for a reasonable amount. GAINSCO has offered no evidence at all to the contrary.

[¶ 73] There are several things wrong with this analysis. First, the Contract between Amoco and Andrews, together with the Gainsco policy, clearly limited Andrews' indemnity liability to Amoco to a maximum of $300,000.00. Consequently, Gainsco's rejection of the $297,000.00 settlement offer did not expose Andrews to "liability far in excess of the policy limit...." Second, Amoco's evidence of the reasonableness of the settlement went to its settlement with the Abraham Estate, not its settlement with Andrews. In truth, the record is devoid of any reasonable explanation for two of the four primary terms of the settlement: the judgment amount greatly beyond the risk and dismissal of the third-party complaint against Kobbe. And third, Gainsco was not notified prior to settlement that the third-party complaint would be dismissed. Thus, the settlement prejudiced Gainsco's ability to continue to defend Andrews.

[¶ 74] There can be no cause of action for third-party bad faith until a judgment has been entered against the insured in excess of policy limits. *Jarvis,* 948 P.2d at 901–02; *Marathon Ashland Pipe Line LLC,* 243 F.3d at 1250; *Sabins,* 82 F.Supp.2d at 1278. Where the judgment amount has been determined not by trial, but by a settlement between the insured and the claimant, without participation by the defending insurer, the insured or the claimant, as assignee, has the burden of proving the reasonableness of the settlement. *Morris,* 741 P.2d at 253. One factor in the consideration of reasonableness is the adequacy of any pre-settlement notice to the insurer. *Spangler,* 881 F.Supp. at 545. Unless the insured or the claimant proves that the settlement was reasonable, "neither the fact nor amount of liability to the claimant is binding on the insurer...." *Morris,* 741 P.2d at 253.

[¶ 75] The Amoco–Andrews settlement is not binding on Gainsco. Absent the unreasonable settlement amount, there could have been no judgment in excess of policy limits. Beyond that, the settlement compromised Gainsco's right to recoup an appropriate percentage of the judgment from Kobbe because the third-party complaint against Kobbe was dismissed with prejudice.

**Issue No. 10: Does the law of the case doctrine prevent Gainsco from raising the argument in this appeal that the express $300,000.00 limit of Andrews' liability contained in the Contract is a complete defense to any bad faith claim asserted by Amoco?**

[¶ 76] On March 17, 1994, Amoco filed its complaint against Andrews seeking indemnity for its settlement with the Abraham Estate. Despite the contractual limitation of $300,000.00, the prayer for relief in that complaint sought from Andrews $716,490.80, which amount equaled the $650,000.00 settlement plus $66,490.80 in attorneys' fees and costs. The answer filed a little more than a month later by the attorney hired by Gainsco to represent Andrews admitted the existence of the Contract, but did not mention or raise as an affirmative defense the Contract limitation. Further, when Andrews stipulated to entry of the judgment against it for $795,901.00, Gainsco did not appeal that judgment on the ground that it exceeded Andrews' contractual obligation. It is Amoco's contention now that, once that judgment became final without appeal, it became the "law of the case."

[¶ 77] Citing *Lyden By and Through Lyden v. Winer,* 913 P.2d 451 (Wyo.1996), Amoco contends that Gainsco should be barred from raising this defense because it was not raised in the district court before judgment was entered. *Lyden* says that the "law of the case" doctrine requires that a court's decisions on issues of law be followed in later stages of the proceedings. *Id.* at 454. We discussed the law of the case doctrine in more detail in *Triton Coal Co. v. Husman, Inc.,* 846 P.2d 664, 667–68 (Wyo.1993):

Under the "law of the case" doctrine, a court's decision on an issue of law made at

one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation.... The "law of the case" is a doctrine designed to avoid repetitious litigation and to promote consistent decision making. As such, it is in the same family as res judicata, collateral estoppel, and stare decisis.... Most commonly, the "law of the case" requires a trial court to adhere to its own prior rulings, adhere to the rulings of an appellate court, or adhere to another judge's rulings in the same case or a closely related case.... Triton, however, relies upon a fourth and much less utilized aspect of the rule in which a court's ruling on an issue that could have been appealed, but was not, will be given preclusive effect.... Although some courts label this fourth category as the "law of the case," it is something of a misfit. Generally, the "law of the case" arises because a court has ruled on a matter and that ruling is to be applied to subsequent proceedings in the litigation. However, in the fourth category relied upon by Triton, it is the litigant's failure to raise an issue on appeal which gives rise to the preclusive effect of the lower court's ruling, not a court ruling.

[¶ 78] We do not find *Lyden* or *Triton Coal Co.* to be on point. The present situation is not one where Gainsco failed to raise on appeal the district court's ruling on the issue of the contractual limitation. Rather, this situation involves Gainsco raising an issue on appeal that allegedly was not raised below. In that regard, as we explained previously, the copy of the Amoco/Andrews Contract attached to Gainsco's summary judgment motion contained not only the indemnity provision, but also the limitation thereon, and so the matter was before the district court. Furthermore, Gainsco contended in its motion that Andrews had settled without determining its available defenses, which is at least arguably a reference to the implied indemnity obligation of Kobbe.

[¶ 79] Even if we were to accept Amoco's assertion that Gainsco did not directly ad-

dress this point in a separate motion or in argument, we would consider the issue under the particular facts of this case. While we generally are reluctant to consider matters not presented to the district court, we will do so when a matter is so fundamental in nature that the ends of justice require its consideration. *Simek v. Rocky Mountain, Inc.,* 977 P.2d 687, 689 (Wyo.1999); *Allen v. Allen,* 550 P.2d 1137, 1142 (Wyo.1976). In the instant case, the fact that Andrews' indemnity exposure was contractually limited to the $300,000.00 insurance coverage is so central to the issue of third-party bad faith that it cannot be ignored.[12] In particular, it is impossible to evaluate the reasonableness of the settlement reached between Amoco and Andrews without considering the indemnity limitation in the contract.

**Issue No. 11: Does the indemnity provision of the contract between Amoco and Andrews violate Wyo. Stat. Ann. § 30–1–131 (LexisNexis 2001)?**

 [¶ 80] The Wyoming State Legislature has codified a policy, limited to contracts "pertaining to any well for oil, gas or water, or mine for any mineral," that prohibits agreements indemnifying an indemnitee against liability for its own negligence:

(a) All agreements, covenants or promises contained in, collateral to or affecting any agreement pertaining to any well for oil, gas or water, or mine for any mineral, which purport to indemnify the indemnitee against loss or liability for damages for:

(i) Death or bodily injury to persons;

(ii) Injury to property; or

(iii) Any other loss, damage, or expense arising under either (i) or (ii) from:

(A) The sole or concurrent negligence of the indemnitee or the agents or employees of the indemnitee or any independent contractor who is directly responsible to such indemnitee; or

(B) From any accident which occurs in operations carried on at the direction

---

**12.** It is somewhat ironic that Amoco faults Gainsco for not raising the contractual defense. Apparently, neither Amoco nor Andrews considered or raised the issue when they reached a settlement well in excess of the contractual obligation.

or under the supervision of the indemnitee or an employee or representative of the indemnitee or in accordance with methods and means specified by the indemnitee or employees or representatives of the indemnitee, are against public policy and are void and unenforceable to the extent that such contract of indemnity by its terms purports to relieve the indemnitee from loss or liability for his own negligence. This provision shall not affect the validity of any insurance contract or any benefit conferred by the Worker's Compensation Law [§§ 27–14–101 through 27–14–805] of this state.

Wyo. Stat. Ann. § 30–1–131. The agreements meant to be covered by the statute are defined in Wyo. Stat. Ann. § 30–1–132 (LexisNexis 2001):

The term "agreement pertaining to any well for oil, gas, or water, or mine for any mineral" as used in section 1 hereof [§ 30–1–131], means any agreement or understanding, written or oral, concerning any operations related to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or otherwise rendering services in or in connection with any well drilled for the purpose of producing or disposing of oil, gas or other minerals, or water, and designing, excavating, constructing, improving, or otherwise rendering services in or in connection with any mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral, or an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation.

[¶ 81] This Court has found these statutes do not violate equal protection or freedom to contract precepts, and has found their unambiguous intent is to "void[ ] and make[ ] unenforceable any agreement to the extent that it seeks to indemnify an indemnitee for his own negligence-regardless of the character of the negligence sought to be protected."

*Mountain Fuel Supply Co. v. Emerson,* 578 P.2d 1351, 1357 (Wyo.1978). In interpreting "'[t]he catchall phrase, "rendering services . . . in connection with any well," [meaning] activities . . . closely related to well drilling,'" we have held that the statute rendered void a unit operating agreement to the extent that it required non-negligent interest owners to indemnify the operator for the operator's own negligence. *Bolack v. Chevron U.S.A., Inc.,* 963 P.2d 237, 241 (Wyo.1998) (*quoting Reliance Ins. Co. v. Chevron U.S.A., Inc.,* 713 P.2d 766, 770 (Wyo.1986)). Similarly, we have found that a written contract to perform work on oil field pumping units was covered by Wyo. Stat. Ann. § 30–1–131, so the portion of the contract providing indemnity for a party's own negligence was void. *Cities Service Co.,* 705 P.2d at 329. On the other hand, we have concluded that the digging of pits to collect waste fluids from a fire at a separation plant is not "rendering services in or in connection with an [oil] well. . . ." *Reliance Ins. Co.,* 713 P.2d at 769. "[S]ervices or activities having a remote or indirect connection to the kinds of services enumerated" in the statute are not covered. *Id.* at 770.

[¶ 82] An agreement containing a provision violative of the anti-indemnity statute is not void and unenforceable in total, but only to the extent that it violates the statute. *Cities Service Co.,* 705 P.2d at 329. Further, indemnification is not prohibited except for the indemnitee's own negligence. *Hull v. Chevron U.S.A., Inc.,* 812 F.2d 590, 592 (10th Cir.1987); *Heckart v. Viking Exploration, Inc.,* 673 F.2d 309, 312 (10th Cir. 1982). Consequently, the statute is not applicable when the indemnitee is not negligent but is liable only under the respondeat superior theory. *Heckart,* 673 F.2d at 312. The statute is consonant with the public policy of workplace safety that underlies the concept of implied indemnity discussed above.

The result of this case furthers two important public policies. The first and most important is the freedom of persons to contract for legitimate and proper purposes. The second is a policy which encourages safety in the work place. Both *Cities Service* and *Northern Production*

have potential liability for injuries to or death of workmen. Having this potential liability, each party will have a considerable incentive to avoid industrial accidents and injuries. The holding of this court results in each party being responsible for its own activities and liable for loss and damage caused by its own failure to exercise reasonable care in its operations and furthers this beneficial public policy. *Guitard v. Gulf Oil Co.*, 100 N.M. 358, 670 P.2d 969 (1983).

*Cities Service Co.*, 705 P.2d at 329–30. *See also Bolack*, 963 P.2d at 241 and *Schneider Nat., Inc.*, 843 P.2d at 577.

[¶ 83] The Contract was entered into by Amoco and Andrews on May 13, 1986. It is not an agreement for Andrews to do any particular identified project. Rather, it provides that its terms will govern all work performed by Andrews for Amoco "under verbal or written workorders...." In addition to its title, the Contract contains several provisions that do specifically mention the word "well:"

2. In the performance of any operations hereunder [Andrews] shall furnish at its own expense and cost any and all necessary labor, machinery, equipment, tools, transportation and whatever else is necessary in the performance and completion of the work herein provided other than such items thereof as Amoco specifically agrees to furnish.... If, in order to gain access to or return from the well to be serviced, it is necessary to repair roadbeds, or, to provide tractors, vessels, or other special means of transportation for the trucks, equipment, or personnel of [Andrews], such shall be arranged and paid for by Amoco....

. . .

7. Notwithstanding other provisions of this contract, Amoco shall be responsible for and shall secure [Andrews] against any liability for reservoir loss or damage, or property damage arising from a well blowout, unless such damage is caused by the willful negligence of [Andrews].

. . .

14. If equipment or instruments of [Andrews] are lost in the well, Amoco shall either recover same without cost to [Andrews] or pay for such equipment or instruments, unless, however, such loss is caused by the negligence of [Andrews].

[¶ 84] In his answer to Amoco's complaint, the attorney hired by Gainsco to defend Andrews raised Wyo. Stat. Ann. § 30–1–131 as an affirmative defense to Andrews' indemnity liability. Of course, given the settlement between Amoco and Andrews, that issue was never litigated. Gainsco's motion for summary judgment in the present controversy contains the following description of the work Andrews, and its subcontractor, Kobbe, were doing for Amoco under the Contract, including the work being performed by Abraham at the time of his death:

There exists an oil [field] in the Cody/Powell area, known as the Elk Basin Oil Field, in which Plaintiff Amoco Production Company had a significant stake. Amoco contracted with various businesses to perform services in and about the Elk Basin Oil Field.

. . .

Andrews Trucking Company, essentially a one man company owned by Ervin Andrews, worked transporting equipment to various locations in the oil field. Andrews signed a Well and Lease Service Master Contract in May 1986. Andrews made a modest living for a number of years transporting equipment for Amoco and doing a small amount of dirt work.

Prior to 1991, Andrews was approached by the owner of Kobbe Construction Company with a proposition. Kobbe wanted to perform well servicing work for Amoco but perceived a slight problem. The owner of Kobbe Construction was a brother of one of the local supervisors for Amoco. In order to avoid Amoco's rules concerning nepotism, Kobbe Construction proposed working under Andrews' Well and Lease Service Contract as a "subcontractor" to Andrews.... Kobbe would pay Andrews 5% of the gross it received from such work.... The work Kobbe would perform would not compete with Andrews since servicing wells was work Andrews did not

have the equipment, knowledge or manpower to perform.

The Elk Basin Oil Field was the subject of secondary recovery operations involving the injection of fluids into the ground in order to produce additional oil from the geological formations. The oil produced was co-mingled with the fluids injected in settling ponds. Amoco owned a facility [where] there existed tanks into which oil skimmed from these ponds was pumped. One such tank was referred to as a "bad oil tank" because it contained deadly $H_2S$ gas. In this particular field, the poisonous gas, $H_2S$, is produced with the oil and must be handled with great care. Kobbe proposed to conduct this and other well servicing work under Andrews['] contract with Amoco. Andrews had never performed servicing work in connection with oil tanks. Andrews had neither the knowledge nor the equipment to perform such work.

Initially, the agreement between Kobbe Construction and Amoco proceeded smoothly. Andrews made considerably more money from his percentage of Kobbe's work than he did with his own trucking operations. Then, in the Fall of 1991, an employee of Kobbe Construction, Brent Abraham, operating a Kobbe Construction truck containing oil which had been skimmed from a pond, was killed when he was overcome by $H_2S$ gas while delivering oil to a bad oil tank. . . .

The facts indicated that Mr. Abraham decided to check a screen leading to the tank before dumping the oil in his truck and opened a "pod" to check the screen while the valve to the tank was in an open position and without bleeding pressure from the screen pod. As a result poisonous gas spewed onto his clothing and near his breathing zone resulting in his death.

Gainsco then contended in its motion that the indemnity provision of the Contract between Amoco and Andrews that purported to indemnify Amoco for its own negligence violated the anti-indemnity statute because the work being performed under the contract clearly fit the statute's definition of "rendering services in or in connection with any well. . . ."

[¶ 85] In its brief supporting its own motion for summary judgment, Amoco argued that the Contract's indemnity provision did not violate Wyo. Stat. Ann. § 30–1–131 because, just as the work described in *Reliance Ins. Co.*, 713 P.2d at 768, the work being performed by Abraham at the time of his death did not "involve" a well, but occurred at an above-ground separation facility far removed from any well. Amoco then relied on *Brittain v. Booth*, 601 P.2d 532, 535 (Wyo. 1979), for the proposition that an agreement to indemnify a party for his own negligence may be enforced if it is not otherwise contrary to public policy.

[¶ 86] The district court's decision letter makes no mention of the anti-indemnity statute. Gainsco now argues to this Court that the district court "absolutely ignored these arguments and failed to address them. . . ." We see nothing in the record to contradict this assertion. Were this the only issue on appeal, and were there questions of fact remaining in regard to it, we would be compelled to reverse the summary judgment and remand this case for trial. As it is, however, there is no genuine issue of material fact pertaining to this question. Although, by its title, the Contract is a "well and lease service" agreement, the work performed under the contract was not limited to work "closely related to well drilling." *See Reliance Ins. Co.*, 713 P.2d at 770. For instance, as admitted in Gainsco's motion for summary judgment, Andrews worked for years under the contract transporting equipment and doing dirt work.

[¶ 87] The question, then, is whether the work being performed under the Contract at the time of Abraham's death was more akin to the service of pumping units, as in *Cities Service Co.*, and therefore covered by the statute, or to the digging of fluid waste pits after a fire at a separation plant, as in *Reliance Ins. Co.*, and therefore not covered by the statute. We conclude that delivering oil by truck to a tank battery is not an activity closely related to well drilling. Consequently, Wyo. Stat. Ann. § 30–1–131 does not serve to invalidate the contract provision whereby Amoco was indemnified against its own negligence.

[¶ 88] In reaching this conclusion, we have continued to give effect to the rule of statutory construction, *ejusdem generis,* whereby a general term following a list of specifically enumerated terms should be construed as limited to the same genus as the things enumerated. *See Reliance Ins. Co.,* 713 P.2d at 770. As applied to this statute, this rule means that "or otherwise rendering services in or in connection with any well" is limited to those services similar to "drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, [or] plugging...." Wyo. Stat. Ann. § 30–1–132. Without doubt, those terms are directly related to the well, itself, and not to general oil field work. We have also recognized that Wyo. Stat. Ann. §§ 30–1–131 and 30–1–132 restrict freedom to contract, a common law right, and, therefore, must be strictly construed.[13]

## CONCLUSIONS

[¶ 89] Our conclusions, numbered to coincide with the issues presented, may be summarized as follows:

1. The damage element of the tort of third-party bad faith against an insurer for failing to settle a claim may be satisfied despite the inclusion in a settlement between the insured and the claimant of the claimant's covenant not to execute against the insured. This is true even with language in the policy that limits coverage to sums that the insured becomes legally obligated to pay. The district court's ruling was correct.

2. The tort of third-party bad faith requires a judgment in excess of policy limits, and where there is no risk of such judgment, an insurer who declines an offer to settle within policy limits has not acted in bad faith. In the instant case, the contract between Amoco and Andrews specifically limited Andrews' indemnity liability to the amount of the insurance coverage. Therefore, there could be no excess judgment and Gainsco did not act in bad faith

in declining the settlement offers. The ruling of the district court to the contrary was in error.

3. There has been no controlling precedent in Wyoming as to the extent of the total pollution exclusion in a commercial general liability policy. Further, authority nationwide has been split as to whether the exclusion is limited to environmental pollution. Consequently, the question of such coverage was fairly debatable and Gainsco did not commit first-party bad faith in its initial denial of coverage under the exclusion. The ruling of the district court to the contrary was in error.

4. Under an objective standard, Gainsco's denial of coverage based upon its subjective interpretation of the insured contract exclusion in its policy was not reasonable. The language at issue—"the indemnitee's sole tort liability"—simply cannot be twisted to mean "no liability on the part of the indemnitor," as contended by Gainsco. Gainsco's denial of coverage under its unreasonable interpretation of its own policy constituted first-party bad faith. The ruling of the district court was correct.

5. The plain meaning of the language of the total pollution exclusion, as understood by a person in the position of the insured, is that it applies only to the concept of environmental pollution. In the instant case, the exclusion did not negate coverage for the Abraham wrongful death action. Gainsco's denial of coverage based on the total pollution exclusion was, therefore, wrongful. The ruling of the district court was correct.

6. The wording of the insured contract exclusion in Gainsco's policy—wording that originated with Gainsco and exists in no other insurance policy—is ambiguous and must be construed against Gainsco. Since there was no dispute that both Amoco and Abraham/Kobbe would be found at fault, Amoco was not solely liable, and the exclusion did not preclude coverage for Amoco's indemnity claim against Andrews. The ruling of the district court was correct.

---

13. We are not free to legislate. While the public policy of worker safety might be enhanced if the anti-indemnity statute applied to all work done in the oil field, or elsewhere, for that matter, the legislature has not chosen to take that step. We certainly cannot do so in its stead.

7. An insurer who is providing a defense to its insured, but who has declined an offer to settle within policy limits, is not bound by a settlement between the insured and the claimant where the insurer was not given prior notice of the terms of the settlement and was not given an opportunity to participate. In the present case, Amoco and Andrews settled without informing Gainsco of a key settlement term, that being the mandatory dismissal with prejudice of the third-party implied indemnity complaint Gainsco had filed against Kobbe on behalf of Andrews. Gainsco was prejudiced by this lack of notice because it lost the ability to pursue Kobbe, or even to determine Kobbe's share of the fault for Abraham's death. Kobbe's immunity from tort liability under the worker's compensation statutes did not bar the implied indemnity claim. The district court failed even to rule on this issue; it should have ruled in Gainsco's favor.

8. An insurer who is providing a defense under a reservation of rights, and who declines an offer to settle within policy limits, may be held liable for the full amount of a reasonable settlement between the insured and the claimant. In the instant case, however, the settlement between Amoco and Andrews was objectively unreasonable because the settlement amount greatly exceeded the amount of Andrews' risk. The ruling of the district court that Gainsco was liable for the full settlement amount was in error.

9. As stated above, an insurer who is providing a defense under a reservation of rights, and who declines an offer to settle within policy limits, may be held liable for the full amount of a reasonable settlement between the insured and the claimant. In the instant case, however, for two reasons, the settlement is not enforceable against Gainsco. First, as also stated above, the amount of the settlement was objectively unreasonable. And second, the record reveals no justification for the required dismissal with prejudice of the implied indemnity claim against Kobbe. Gainsco was prejudiced by this unreasonable settlement. Were the amount, alone, unreasonable, Gainsco could be held liable just for

its policy limits. But here, dismissal of the implied indemnity action completely foreclosed Gainsco from pursuing Kobbe for its share of the damages. Consequently, Gainsco's obligations under the policy have been voided.

10. Under the "law of the case" doctrine, a court's decision on an issue of law made at one stage of a case must be followed in later stages of the same case. This doctrine does not apply when the question involves raising an issue on appeal that was not raised below. While we generally will not consider issues not raised below, we will do so when the issue is so fundamental in nature that justice requires its consideration. In the instant case, Amoco contends that this Court should not consider the argument that Andrews' indemnity obligation to Amoco was limited to its insurance coverage because Gainsco did not raise this fact as a defense below nor did it appeal the judgment amount that was in excess of that limitation. The "law of the case" doctrine is not applicable in this situation, and we find the matter of the indemnity limitation to be fundamental to the major issues presented in this appeal. In particular, the reasonableness of the settlement simply cannot be judged without reference to this limitation. Further, the limitation was before the district court because it was included in the very contract paragraph upon which the indemnity obligation, itself, was contained.

11. Wyo. Stat. Ann. § 30–1–131 prohibits agreements indemnifying an indemnitee against his own negligence where the agreement pertains to "any well for oil, gas or water, or mine for any mineral. . . ." We have interpreted this prohibition narrowly because it is in derogation of the freedom to contract. Specifically, we have limited application of the statute to agreements covering "activities closely related to well drilling." In the instant case, the activities of Kobbe's employee Abraham, as Andrews' subcontractor under its agreement with Amoco, were only remotely or indirectly related to well drilling, and therefore, the statute did not serve to render

unenforceable Andrews' obligation to indemnify Amoco for its own negligence. The district court failed to rule on this issue; it should have held for Amoco.

[¶ 90] Gainsco should have defended Andrews without a reservation of rights because Amoco's claims were within the coverage of Gainsco's policy. Gainsco is, however, excused from paying even its policy limits because Andrews' unreasonable settlement with Amoco breached the insurance contract. Gainsco is not bound by the settlement because the settlement amount was unreasonable and because Gainsco was prejudiced by its lack of notice of a key settlement term. In addition, Gainsco's refusal to settle within policy limits did not constitute third party bad faith because, absent the unreasonable settlement, there was no risk of a judgment in excess of policy limits.

[¶ 91] We reverse the summary judgment in favor of Amoco and remand to the district court for entry of a summary judgment in favor of Gainsco.